Alfonso Smedley purchased a 1989 Chevrolet "conversion van"[1] from Capitol Chevrolet. Approximately five months later, the van was destroyed by fire. Smedley's insurance carrier, Auto Owners Insurance Company, investigated the fire and paid Smedley $24,567 for the van, pursuant to a policy in effect at that time. Smedley then signed a subrogation agreement with Auto Owners. Smedley and Auto Owners Insurance Company (hereinafter referred to collectively as "Auto Owners") sued Capitol Chevrolet and General Motors (hereinafter referred to collectively as "GM") to recover for the damage to the van and for the personal property that was destroyed in the fire. Auto Owners alleged a breach of warranty (express and/or implied) or liability under the Alabama Extended Manufacturer's Liability Doctrine (AEMLD). The jury returned a general verdict for $20,000 in favor of Auto Owners and against GM. The trial court denied Auto Owners' petition for attorney fees. GM appeals the holding of liability, and Auto Owners appeals the denial of attorney fees.
GM argues that Auto Owners should not recover because the van was not available for inspection; it had been destroyed before this action was filed. In other words, GM contends that due to "spoliation" of the evidence, the trial court abused its discretion in not dismissing the case. In the alternative, GM contends that it has no liability under the AEMLD because, it says, Auto Owners failed to establish the existence or the source of the alleged defect.
The record reveals the following: In July 1989, Smedley purchased a 1989 Chevrolet conversion van from Capitol Chevrolet. Subsequently, Smedley had additional after-market options placed on the van by entities other than Capitol Chevrolet or GM; specifically, he added a burglar alarm, a trailer hitch, special rear taillights, and a visor on top of the windshield.
Smedley used the van for general use and for traveling around the country, carrying his jazz band members and equipment to various locations. From the time Smedley purchased the van in July 1989, until the time of the fire on December 9, 1989, the van had accumulated over 18,000 miles. During this time, Smedley testified, the van experienced no problems and the only work performed on it consisted of changing the oil every 4,000 miles.
On December 9, 1989, Smedley and four other band members were traveling to Texas for a concert. En route to the concert, the van caught fire and burned. The van was towing a trailer, which also was destroyed in the fire. Smedley testified that at the time of the fire, the stereo, radar detector, CB radio, lights, and windshield wipers were on and were working. He stated that he had had no trouble with any of that equipment and that he had not smelled any gasoline or heard any unusual noises. Smedley stated that he had stopped and filled the tank with gasoline at approximately 1:30 a.m. and then had driven 18 to 20 miles when the van experienced a reduction in power. He stated that he stopped the van and turned off the engine and that when he stopped the steering system was operable and the lights and the windshield wipers were working. During this stop a fire started in the engine compartment of the van. *Page 441 
The van burned the entire time until fireman arrived, between an hour to an hour and a half later. The van, the trailer, and all of the equipment inside the trailer were involved in the fire. The burned van and trailer were towed to Benoit Wrecker Service Company in Louisiana.
Within days of the fire, Auto Owners, as Smedley's insurance carrier, hired an appraisal firm to evaluate the damage to the van. The appraisal firm examined the van but could not determine the cause of the fire. Auto Owners then hired "Bud" Stringer to inspect the van and the trailer to determine the cause and origin of the fire.
Mr. Stringer's report stated that the exact source could not be determined, but that the fire was the result of an unknown defect within the engine compartment. He described the area within which he found the origin of the fire as "somewhere in the engine compartment." He then stated that the engine compartment consists of essentially everything under the hood of the vehicle, running from the right wheel to the left wheel, the front grill to the fire wall, and that it extends beyond the firewall into the area between the two front seats of the van. Further, he agreed that it consists of all that is under the hood, down to the bottom of the oil pan.
On January 11, 1990, Auto Owners paid Smedley $24,567 and Smedley, in turn, signed a subrogation agreement. Eighteen days later, on January 29, 1990, Auto Owners authorized the disposal of the van in order to stop accruing more charges for storing it. Neither Capitol Chevrolet nor GM had had the opportunity to inspect the van or the trailer. The van was destroyed before Capitol Chevrolet or GM was notified of any claim; in fact, this action was filed approximately 11 months after the van had been sold for salvage.
Several times before and during the proceedings, GM requested that this case be dismissed due to the "spoliation" of the evidence. In support of its request, GM presented the affidavit of Jim Nelander, a senior staff analysis engineer who had worked for GM for over 30 years. Nelander stated that one of his primary functions was to investigate motor vehicle fires in an effort to determine their cause and that he had investigated over 500 truck and van fires.
Nelander stated that he had reviewed the available file material in this case to determine the cause and origin mechanics of the fire, including Smedley's testimony and information about the history of the vehicle. He also stated that he reviewed all of Smedley's material regarding the fire, as well as photographs taken by Mr. Stringer. He concluded that because of the limited information available (that information was limited because of the destruction of the van and trailer) he had been placed "in an extreme disadvantage in determining the true cause or origin of this fire." He added: "An important aspect of determining the exact cause or origin of vehicle fires is an examination of the van as well as any trailer involved in the accident and the fire artifacts at the scene."
He further said that the photographs taken by Smedley's expert were inadequate because, he said, they reflected that expert's findings and conclusions and did not present a complete picture of the van in the detail necessary for him to determine the exact cause and origin. He stated that he would normally examine the van and any and all caps and fluid lines, and would thoroughly investigate all wires. He stated that in examining the wires he would actually touch the wiring and would perform microscopic evaluations of the wiring if necessary. Further, he said he would look for stains in the vehicle, as well as burn patterns. He stated that the photographs limited his examination to what Stringer had photographed and that Stringer's photographs "reflect[ed] his myopic point of view only." Mr. Nelander further said:
 "[W]e were not able to examine the trailer, extra wiring added on, as well as modifications to this van. . . . Additionally, the plaintiffs made post-sale modifications to the van, including a burglar alarm system among other things. This auxiliary wiring, lighting and the like *Page 442 
were not capable of being examined. Were this a General Motors product, and no post-sale modifications were made, I could go back to drawings of our own vehicles and make certain determinations from those drawings. But with the addons and auxiliary equipment in this case, I cannot know with certainty exactly what wires belonged to the product as originally designed and manufactured and what were added on thereafter.
 "In conclusion, I have been prevented from determining the exact cause and origin of this fire and performing the investigation that I would have performed had the plaintiffs retained the van and trailer to allow us the opportunity to review the same and investigate this fire thoroughly."
At the outset we note that the sanction of dismissal is the most severe sanction that a court may apply. Iverson v. XpertTune, Inc., 553 So.2d 82 (Ala. 1989). However, we also recognize that in some cases such a severe sanction may be the only appropriate remedy. See Cincinnati Ins. Co. v. Synergy Gas,Inc., 585 So.2d 822 (Ala. 1991).
In Iverson, this Court upheld the trial court's sanction of dismissal. There, Iverson sued Xpert Tune, Inc., alleging that Xpert had diagnosed Iverson's automobile as having a defective fuel pump, when, in fact, he alleged, the fuel pump was in good working order. Xpert filed a motion with the trial court requesting production and/or inspection of the fuel pump. Iverson did not produce the fuel pump, and, in fact, allowed it to be destroyed. In Iverson, the trial court, as well as this Court, focused on dismissal of an action for refusal to provide discovery. The trial court specifically found that "Iverson willfully discarded the fuel pump to avoid production." Iverson
at 86.
This case is different from Iverson in that in this case no court had ordered discovery. Rather, the destruction of evidence occurred 11 months before this action was filed against GM.
In a factually similar case in Nevada, the trial court dismissed the case because of the plaintiff's failure to preserve evidence. Stubli v. Big D Int'l Trucks, Inc., 107 Nev. 309, 810 P.2d 785 (1991). There, the plaintiff was involved in a single-vehicle accident while driving his tractor-trailer rig. He contended that the accident was caused by misalignment problems with the trailer's suspension system. Following the accident, the plaintiff submitted a claim to his insurer and the insurer retained an expert to inspect the trailer wreckage for mechanical defects. The expert examined and photographed the damaged trailer and submitted a report to the insurer.
The insurer later, when notified that the fees for storing the trailer would soon surpass the trailer's salvage value, removed the basic assembly as it related to the development of a product liability defect and discarded the trailer wreckage as salvage. Several months later, the plaintiff sued the manufacturer of the trailer, alleging defective design. The defendant moved to dismiss, claiming that "[plaintiffs] failure to preserve the trailer . . . had made it impossible for [the defendant] to establish [its] defense theory." Stubli, at 787.
This Court also addressed a similar situation inCincinnati Ins. Co., 585 So.2d 822. There, the trial court found that the plaintiffs had deliberately disposed of certain items that later became the subject of production. No one alleged a malicious intent in destroying the items. The trial court specifically held that the plaintiff homeowners' conduct " 'might be excusable' because of their lack of knowledge of the importance of preserving evidence for future litigation." 585 So.2d at 827. However, the trial court could find no justification for the conduct of the plaintiff Cincinnati Insurance Company (the homeowner's insurance carrier). The trial court found that Cincinnati Insurance Company had willfully allowed the destruction of the items, with full knowledge of the importance of those items as evidence in future litigation.
Here, Auto Owners' claims revolve around the allegedly defective design of the van, which Auto Owners ordered destroyed *Page 443 
(sold for salvage). A reasonable person could have concluded, when Auto Owners dispatched its expert, Mr. Stringer, to inspect the van and to make photographs, that Auto Owners might sue. According to testimony, however, Auto Owners just did not want to accrue any more charges for having the van stored, so it ordered it salvaged. The stark result is that relevant evidence was irreparably lost by the actions of Auto Owners. We conclude that the trial court abused its discretion in not dismissing the case.
Although dismissal precludes an adjudication on the merits, such a consequence is unavoidable in the present case. While the outcome may appear harsh to Smedley, we note that Auto Owners has already paid him over $24,000 for the loss of his vehicle. Further, we note that Smedley's homeowner's policy paid him for the personal property lost in the fire. We point out that this is basically a subrogation claim brought by the same insurance company that ordered the destruction of items that would have been crucial evidence in that company's action.
We pretermit any discussion of the other issues raised by the appeals.
The judgment is reversed and the cause remanded to the trial court with instructions to dismiss the case.
REVERSED AND REMANDED WITH INSTRUCTIONS.
HORNSBY, C.J., and ALMON, ADAMS and STEAGALL, JJ., concur.
[1] A conversion van is one that undergoes substantial modification after its original manufacture. The conversion van in this case was purchased from General Motors by Trans-Aire International, Inc., where the van was modified before it was sold to Capitol Chevrolet. Trans-Aire is not a party to this suit.