[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 86 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 87 
These cases are the result of a fire that destroyed a video rental store in Bessemer on July 24, 1998. Vesta Fire Insurance Corporation ("Vesta") insured the premises for the owner of the building, and Wausau Insurance Company ("Wausau") insured the store's inventory for Hollywood Entertainment Corporation ("Hollywood"), which owned the inventory. Vesta and Wausau sued, as subrogors of their respective insureds, Landmark Electric Company, Inc. ("Landmark"); Milam Company Construction, Inc. ("Milam"); Sentry Heating Air Conditioning ("Sentry"); Sure Air, Ltd.; Lenz-Ramseur, Inc.; and DesignWorx, Inc., alleging that the defendants, as contractors and subcontractors responsible for the construction or maintenance of the building that housed the video rental store, had negligently designed, constructed, *Page 88 
and maintained the building and thereby had caused the fire that destroyed the building and its contents. The plaintiffs alleged that the defendants had improperly installed and maintained the electrical components in the air-conditioning system and that that improper installation and maintenance had caused the fire. Vesta filed its action in January 1999, and Wausau filed its action in July 2000. Both plaintiffs asserted substantially the same claims; those included claims of negligence, breach of warranty, and claims under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). The trial court consolidated the two cases for adjudication.
After extended discovery, the defendants filed motions for a summary judgment. After a hearing, the trial court entered a summary judgment for each defendant against both plaintiffs. The summary judgments as to the plaintiffs' claims were based on the trial court's determination that the plaintiffs' conduct had resulted in spoliation of the evidence. In addition, the trial court held that the plaintiffs' claims against Lenz-Ramseur were due to be dismissed on the additional ground that the plaintiffs had presented no expert evidence indicating that Lenz-Ramseur had done anything that had resulted in the fire. As to Landmark, the trial court found additionally that no warranty existed between the plaintiffs and Landmark and that the plaintiffs' breach-of-warranty and negligence claims against Landmark were subsumed in their AEMLD claims against that defendant. The trial court entered a summary judgment for DesignWorx, the architect for the building, on Vesta's claim alleging that it had failed to conduct an inspection of the building based on its finding that Hollywood had assumed all duties of inspection.[1]
In addition to the plaintiffs' claims, Sentry had filed cross-claims against Sure Air, and the trial court entered a summary judgment for Sure Air as to those cross-claims.[2]
The plaintiffs appealed. Landmark and Sentry cross-appealed, arguing that they were entitled to summary judgments on grounds other than spoliation of the evidence. The remaining appellees also assert that the summary judgments in their favor are supportable on grounds other than spoliation. We reverse and remand.
On appeal, the plaintiffs argue that the summary judgments were improper because there were genuine issues of material fact as to the cause of the fire. The defendants argue that the plaintiffs' investigators who examined the premises immediately after the fire retained only those materials they thought were relevant to their investigatory conclusions and that the premises and remaining evidence were demolished before the plaintiffs filed their respective actions; the defendants assert that the plaintiffs' failure to preserve relevant evidence resulted in the loss of evidence critical to the defense.
Our review of a summary judgment is de novo.
 "In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and *Page 89 
whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542
(Ala. 1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543
(quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997). Further, in determining whether the summary judgments for the defendants were proper on the ground of spoliation of the evidence, we consider whether the trial court exceeded its discretion in entering the summary judgments. See, e.g.,Cincinnati Ins. Co. v. Synergy Gas, Inc., 585 So.2d 822 (Ala. 1991); Iverson v. Xpert Tune, Inc., 553 So.2d 82 (Ala. 1989); and Copenhagen Reinsurance Co. v. Champion Home Builders Co.,872 So.2d 848 (Ala.Civ.App. 2003), all discussed infra.
The record shows that in January 1997, pursuant to an agreement with Hollywood, A M Bessemer, LLC ("A M"), contracted with Milam to construct a Hollywood Video video rental store at the West Lake Mall in Bessemer. The agreement between A M and Hollywood provided that A M owned the physical structure, i.e., the building housing the video rental store, and Hollywood owned the contents, i.e., the video media that would be rented or sold to the public. Hollywood employed DesignWorx as the architect for the building, and Milam, as the general contractor, employed various subcontractors, including Landmark. Landmark was to perform specified electrical work. The heating, ventilation, and air-conditioning ("HVAC") system for the building was provided and installed by Lenz-Ramseur, doing business as Standard Heating and Air Conditioning, Ltd., and Sure Air was to provide service and maintenance for the HVAC. Sure Air subsequently subcontracted with Sentry for Sentry to perform the service and maintenance under Sure Air's agreement with Hollywood.
While the store was being built, Landmark constructed the circuitry necessary to supply electrical power to the HVAC; that circuitry included a "service disconnect" (a fuse box located on the side of the building) and a "unit disconnect" (a fuse box located on the HVAC unit). Although design plans originally called for a "York" brand HVAC unit, Hollywood substituted a "Trane" brand unit. The Trane HVAC unit was installed by Lenz-Ramseur and Lenz-Ramseur performed some preliminary tests on the unit; thereafter, Sentry performed the maintenance on the unit. In addition to regular maintenance checks, Sentry's work included replacing a bad condenser fan motor, a "rainshield," and a "blade" in December 1997, reconnecting a wire leading to compressor number one on May 19, 1998, and installing on July 1, 1998, split bolts[3] to repair a problem Sentry's *Page 90 
service technician believed related to an internal electrical terminal strip that was causing a circuit breaker for the compressor to trip. With respect to the July 1, 1998, repair, Sentry's service technician, Lance Langley, had been called to the store because the HVAC was not working properly; he determined that compressor number two was not working because that circuit breaker for that compressor had been tripped. He tested the unit and discovered a voltage imbalance, which he testified he corrected by installing the split bolts. He further testified that after the repair, he conducted tests that showed that the voltage imbalance had been corrected, and he noted that the unit "ran fine" after the repair. Other problems noted during the operation of the building involved flickering and buzzing in the neon-lighting system.
As a result of the fire, Vesta paid A M $468,192 pursuant to its insurance policy and became subrogated to A M's rights for the recovery of damages caused by the fire. Similarly, Wausau paid Hollywood $442,298 under its policy and became subrogated to Hollywood's rights for the recovery of damages.
A City of Bessemer police officer saw the fire at the video rental store between 7:00 and 8:00 a.m. on July 28, 1998. Fire-fighters who soon arrived at the scene testified that they saw flames emerging from the right rear third of the building. The blaze completely destroyed the building and its contents. An internal security camera, one of six video cameras that were part of the security system for the video store, showed that the building began filling with smoke and showed fire "falling" from the ceiling toward the rear of the building.
On the day of the fire Vesta employed Robert Young, a certified fire investigator of considerable experience, to investigate the fire. The City of Bessemer did not conduct any independent investigation of the fire; instead it relied upon Young, who directed fire department employees at the scene. Young investigated the scene of the fire on the day of the fire and for several days thereafter. Young's report, dated September 14, 1998, concluded that the fire originated in the attic of the building near a steel I-beam described as being in the rear third of the building to the right of center; the I-beam was badly twisted as a result of the fire. Young determined that the fire was caused by an electrical malfunction. In his subsequent deposition, Young stated that during his investigation he observed approximately 25 "arcs" or burn areas caused by electrical short circuits and that approximately eight of those arcs were in the vicinity of the HVAC system. Young's report also states that the fuse boxes located on the outside of the building, "most" of the electrical conduit to the HVAC, and the HVAC unit itself were removed and placed in a secured location after the fire. Young testified that he relied on experts in electrical engineering in concluding that the origin of the fire was electrical. He stated that he was not prepared to offer expert testimony beyond his conclusion as to the general location where the fire started and his opinion that its cause was electrical. Young testified that he had been informed by store employees of problems with the neon lighting; this neon lighting was located on the interior rear and right wall and along a diagonal office wall near the center of the store. Young stated that he did not investigate the transformers for the neon lights because such an investigation needed *Page 91 
to be performed by an electrical engineer.
Charles Point, an electrical engineer Young hired to help with the investigation, agreed that the origin of the fire was electrical but was unable to specify a cause. Young also testified that he was not satisfied with Point's investigation of the fire, which Young thought was somewhat cursory, because Point was not able to pinpoint the cause of the fire. Point had observed approximately 23 different arcs and short circuits in the area of the origin of the fire, and approximately 13 of those arcs and short circuits were found in the 120-volt circuits that provided electricity to the receptacles, fluorescent lights, and neon-sign transformers in the building rather than in the circuits that provided electricity to the HVAC system. Point reported that he had discovered improperly installed electrical conduit to the HVAC system and that some of the air-conditioning conduit had an oily substance on the surface that could have degraded the wires and resulted in short circuiting. However, Point also reported:
 "I cannot say with any engineering degree of certainty that this is what occurred in this particular case since I found short circuits along the 120 volt system as well. It is virtually impossible for me to ascertain which of the approximately 23 different short circuits I found caused the fire. There is no proven method to ascertain which short circuit came first."
After a further discussion of the possible causes of the fire and where particular circuit breakers and fuses were blown, including the fact that no fuses were blown on the service disconnect for the HVAC unit, Point concluded:
 "In summary, it is my opinion that the electrical system was the cause of said fire, but its exact origin and exact circuit which short circuited and arced, cannot be ascertained. It cannot be ascertained simply due to the fact that numerous short circuits were located in the general area of origin and it is impossible to determine the first arc which caused the fire, even by the electron auger method."[4]
Young employed Jim Jones, an electrical engineering professor at the University of Alabama at Birmingham, as another expert to examine the scene. Young and Jones examined the scene on August 3 and 5, 1998. Young's reports issued in August and September 1998 state that Jones had determined that the HVAC unit caused the fire and would issue a report with details. In a preliminary insurance report dated September 15, 1998, Vesta attributes to Jones a theory that a lubricant used to pull the electrical wires through the conduit to the HVAC unit corroded the insulation of those wires and caused short circuits, which caused the fire. In a report dated November 30, 1998, Jones stated that "the failure to derate the conductors to the roof top air conditioner as required by the NEC [National Electric Code] was the direct cause of the fire." Jones explained the concept of "derating" as ensuring that conductors, wires, and insulation are adequate to accommodate the electrical current passing through them. His report indicated that the fire resulted from arcing caused by the use of undersized wires to the HVAC unit given the amount of electrical current used by the unit and the ambient temperature on the roof where the unit was located. Jones's report also noted, among other things, that the HVAC unit had been vandalized after the fire and *Page 92 
that the vandals had removed copper conductors and attachments that had been referred to in the earlier reports by Young and Point.
In his deposition taken on April 25, 2001, Jones admitted that his conclusion that the failure to derate the conductors to the HVAC unit was the cause of the fire was unsound and that he did not know that the combination of conductors to the HVAC unit was the cause of the fire. Specifically, he stated that he was uncertain as to the size of the wire that conducted electricity to the HVAC unit and that he could not make a conclusion as to the cause of the fire until he investigated further. In a subsequent deposition, taken a year later, Jones acknowledged that although he was aware of possible problems with the neon-lighting systems, including the fact that flickering neon signs could indicate short circuits that had the potential to cause fires, he did not investigate those systems.
On April 2, 2002, Jones issued a supplemental report to his November 1998 report, stating that his earlier analysis was incomplete because of a miscommunication with Young. Jones offered a different explanation for the cause of the fire, stating that the fire was caused by a short circuit in the conduit to the HVAC unit resulting from damage to the insulation of the phase conductor and inadequate grounding of the electrical service. Essentially, Jones concluded that the insulation on one of the wires to the HVAC unit had been nicked or scraped, which eventually led to the short circuit that caused the fire. Jones attributed those defects to faulty electrical work, and he speculated that because Sentry's work order of July 1, 1998, did not specifically state that the technician tested the HVAC voltage after his repair, no such test had been performed, and that had such a test been performed, it would have shown a continuing voltage imbalance caused by the defect in the insulation. Both Young and Jones conceded in their depositions that the wiring insulation in the HVAC conduit could have degraded, or melted, as a result of heat from a fire that had begun in another location. In paragraphs 23 and 24 of an affidavit given on February 25, 2003, Jones stated:
 "When I prepared my original report, I determined that the only way the fire could have started would have been the failure of insulation on phase conductors to the HVAC unit, causing an arc to the conduit in question. At that time, I knew that the failure of the insulation would be caused by one of only two possibilities: (1) a nick or other damage to the insulation, or (2) an over current condition causing degradation, or flow, of the insulation due to ambient heating. At that time, and functioning on inaccurate information based on a miscommunication with Robert Young, I believed the most likely reason for the failure of the insulation was over-current and the resultant degradation, or flow, due to ambient heating. Even at that time and with that inaccurate data, I believed that a nick or other physical damage to the insulation was one of two possible causes of the insulation failure."
 "I later determined that the original data I received was inaccurate, and revised my calculations accordingly. At that time, I realized that over-current and the resulting degradation or flow of insulation due to ambient heat was not likely. Thus, the only way this fire could have occurred would have been a nick or other damage to the conductor insulation present during installation. Thus, what defendants' counsel refers to as my `nick theory' was not developed recently. I developed it before my first written report of November, 1998." *Page 93 
J. Arthur Smith, a member of A M and the sole stockholder of the Wilchester Realty Group, the owner of the real estate on which the building owned by A M was located, stated in an affidavit that "several weeks after the fire, I was required by the City of Bessemer to demolish the remains of the structure and clean off all debris in the time restraints imposed by the City of Bessemer." The record does not provide a time frame for the demolition. Even though Jones had requested that the entire HVAC conduit be salvaged, and Young testified that he had intended to save all such items, the building's demolition resulted in the loss of a section of undamaged HVAC conduit "from about in front of the office back to the back wall" as well as all the other electrical components in the building that Point had noted showed signs of arcing or short circuits, including the electrical receptacles, fluorescent fixtures, and neon-sign transformers. Young's explanation for his failure to salvage the evidence was that he forgot to tell the contractor to notify him before it demolished the building.
Sentry presented evidence detailing its maintenance work on the HVAC, which included the affidavit of Lance Langley concerning the terminal strip repair he performed on the HVAC on July 1, 1998, and portions of Jones's testimony stating that he found nothing wrong with Langley's repair of the HVAC. In addition to Langley's affidavit, Sentry presented his deposition testimony that he did in fact perform a voltage test on the HVAC system after he finished his repairs of the system on July 1, 1998, and that the test showed no voltage imbalance. Landmark presented the deposition of David Smith, a certified fire inspector, who testified that no expert could reasonably form an opinion as to the cause of the fire because so many of the components of the electrical system were missing, including various components of the electrical system that supplied power to the HVAC unit. Smith characterized Jones's conclusions that the fire was caused by faulty electrical work as speculative and without evidentiary foundation.
 Spoliation
Because the trial court stated that spoliation of the evidence was the basis for its entering the summary judgments for all of the defendants, we first consider the application of that doctrine to the facts of this case. "Spoliation is an attempt by a party to suppress or destroy material evidence favorable to the party's adversary. May v. Moore, 424 So.2d 596, 603 (Ala. 1982)." Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166, 176
(Ala. 2000). As a general rule, if the trier of fact finds a party guilty of spoliation, it is authorized to presume or infer that the missing evidence reflected unfavorably on the spoliator's interest. McCleery v. McCleery, 200 Ala. 4,75 So. 316 (1917). Spoliation "is sufficient foundation for an inference of [the spoliator's] guilt or negligence." May v. Moore,424 So.2d 596, 603 (Ala. 1982). See also Wal-Mart Stores, supra,789 So.2d at 176; Christian v. Kenneth Chandler Constr. Co.,658 So.2d 408, 412 (Ala. 1995). Spoliation can have special consequences, i.e., sanction under Rule 37, Ala. R. Civ. P., when a party frustrates a discovery request by willfully discarding critical evidence subject to a production request. Iverson v.Xpert Tune, Inc., 553 So.2d 82 (Ala. 1989). In such a situation, where the plaintiff is guilty of spoliation, the sanction of dismissal of the claim may be warranted. Iverson, supra. Dismissal for failure to comply with a request for production may be warranted even when there was no discovery pending or even litigation underway at the time the evidence in question was discarded or destroyed. *Page 94 Cincinnati Ins. Co. v. Synergy Gas, Inc., 585 So.2d 822 (Ala. 1991).
In Cincinnati Insurance Co., the insureds' house was destroyed by fire. Within three days Cincinnati Insurance Company, the insurer, had a special fire investigator on the scene; he, in turn, enlisted the services of an engineering professor to inspect the site. The engineering professor examined "`the water heater, furnace, tank, LP gas piping, furnace burner ribbons, a broken pipe fitting on the LP gas line and the regulator located on the 500-gallon tank.'" 585 So.2d at 823. The experts soon concluded that the LP gas system installed by Synergy Gas, Inc., was the cause of the fire. Subsequently, while the house was being rebuilt, the homeowners, with Cincinnati's knowledge and approval, allowed all of the "appliances, pipe, and all of the LP gas system," with the exception of the regulator, which had been removed by a representative of the Alabama LP Gas Board, to be discarded. Almost two years after the fire, the homeowners and Cincinnati, as their subrogee, sued Synergy. Synergy sought production of the LP gas system and the appliances, which were by then unavailable. The trial court dismissed the case as the sanction it deemed appropriate under Rule 37, Ala.R.Civ.P. This Court affirmed the dismissal as to all of the claims predicated on the alleged malfunction of the components of the gas system that were destroyed, but reversed the dismissal of the claim insofar as it was based on the theory that the preserved regulator was defective and that it alone caused the fire.
 "This Court has a long-established and compelling policy objective of affording litigants a trial on the merits whenever possible. Although we do not condone the plaintiffs' willful destruction of the most crucial pieces of the evidentiary puzzle in this case, after careful review we are persuaded that, in keeping with this policy objective, the plaintiff should be allowed to proceed to trial, but solely on the theory that the gas regulator was defective and that that defect alone caused the fire."
585 So.2d at 827 (citations omitted). The Court concluded that Cincinnati was aware soon after the fire that litigation was likely and yet allowed the destruction of the items in question with full knowledge of the importance of those items as evidence, thereby warranting dismissal of the claims relating to those items. Restricting the plaintiffs to a single theory of recovery, based on the allegedly defective condition of the regulator, served "to punish them for their willful destruction of crucial evidence" and also assured Synergy "of an opportunity to present an adequate defense." 585 So.2d at 827-28.
The trial court had analyzed the spoliation issue in terms of four factors: the importance of the evidence destroyed; the culpability of the offending parties; fundamental fairness; and alternative sources of information. This Court set out the trial court's entire order describing those factors, with apparent approval. In particular, the Court emphasized the significant role "culpability" should play, quoting from Iverson, supra, the propositions that "`"willfulness" on the part of the noncomplying party is a key factor supporting a dismissal'"; that a "`willful and deliberate disregard of reasonable and necessary requests for the efficient administration of justice'" justifies a dismissal; and that "`litigants who have manifested willfulness and bad faith in failing to produce or in allowing spoliation'" should receive the ultimate sanctions. 585 So.2d at 826-27. The trial court had noted in its order that "`there has been no allegation of malicious intent,'" but that, nonetheless, it was inconceivable that an insurance company in *Page 95 
Cincinnati's position "`could fail to realize the importance . . . in future litigation'" of the evidence it allowed to be destroyed. 585 So.2d at 824.
At its most flagrant level, the willfulness component of the culpability factor involves knowledge and appreciation by the spoliator that the evidence being destroyed would be pertinent and materially favor the interest of his opponent in litigation being anticipated by the spoliator. McCleery, supra; May, supra; Verchot v. General Motors Corp., 812 So.2d 296 (Ala. 2001). "When a party maliciously destroys evidence, that is, with the intent to affect the litigation, that party is more culpable for spoliation." Cooper v. Toshiba Home Tech. Corp.,76 F.Supp.2d 1269, 1274 (M.D.Ala. 1999). Conversely, willfulness is not shown where the party disposing of an item neither knew nor should have known that the item would be key evidence in the case. Wal-Mart Stores, 789 So.2d at 176 ("[The defendant] provided no evidence to show that [the plaintiff] intentionally destroyed [the item of evidence] in order to inhibit [the defendant's] case.").
Although this Court did not expressly adopt in CincinnatiInsurance Co., supra, the trial court's four-factor analytical approach, other courts have understood us to have at least approved it. Cooper, supra; Joyner v. B P Pest ControlInc., 853 So.2d 991 (Ala.Civ.App. 2002); Thompson v. Gardner,889 So.2d 596 (Ala.Civ.App. 2004). The parties discuss the factors in their briefs and the factors provide a useful template for an orderly analysis of relevant considerations.
A fifth factor — the possible effectiveness of sanctions other than dismissal — is also pertinent, however. "We recognize that the sanction of dismissal is the most severe sanction that a court may apply. . . . Dismissal orders must be carefully scrutinized and the plaintiff's conduct must mandate dismissal."Iverson, 553 So.2d at 87. Additionally, we must consider the option of affirming the judgment of dismissal as to certain claims but reversing it as to others, depending on the relationship of the claims to the evidence preserved and the evidence destroyed. Cincinnati Ins. Co., supra; CopenhagenReinsurance Co. v. Champion Home Builders Co., 872 So.2d 848
(Ala.Civ.App. 2003); Vesta Fire Ins. Corp. v. Sears, Roebuck Co., 705 So.2d 382 (Ala.Civ.App. 1996).
A. Importance of the evidence destroyed.
This factor must be evaluated in the context of the importance of the evidence that was preserved or otherwise available. That body of evidence includes the observations of the Bessemer policeman who observed the early external manifestations of the fire consisting of a small amount of smoke above the right front of the building followed within a minute or two by a wall of flames shooting up at least 20 feet above the roof, in an area on the right third of the building near the center of the roof. The policeman observed no fire inside the building at that time. Responding firemen saw flames emerging from the right rear third of the building. An internal security camera recorded smoke gathering and then what appears to be fire "falling" from the ceiling in the right rear portion of the building. None of the defendants argue that the fire did not begin in the attic area of the building.
As noted, Young investigated the scene the day of the fire. In succession he retained Point and Jones to investigate the electrical aspects of the fire. All of these individuals made notes and/or prepared reports of their observations and findings, and an extensive number of photographs *Page 96 
were taken. Finally, after Young and Jones concluded that the culprit in the fire in the attic portion of the roof in the right third of the building was a short circuit in the electrical conductors leading to the rooftop HVAC, the decision was made to preserve the wiring and components "germane" to that understanding. Young and Jones had eliminated, to their way of thinking, other causes of the fire and, in the process, other areas of wiring systems and appliances. Removed and stored, and available for inspection by the defendants, were the entire HVAC unit, the unit disconnect panel, the unit's internal wiring, and the conduit forming a part of that unit that had exhibited arcing. Admittedly, some copper conductors originally within the unit were removed by vandals while the fire scene was under the supervision of the Bessemer Fire Department, and a section of HVAC conduit, which Young had intended to preserve but forgot to arrange for its removal before the building was demolished, was also lost. Also not retained were some of the electrical-system components observed by Point. Those were deemed by Young and Jones to exhibit details probably representing only fire damage. No portion of the neon-lighting system that remained after the fire was preserved.
Thus, this is not a case where all of the critical evidence is unavailable, such as was the situation in Verchot, supra,Capitol Chevrolet, Inc. v. Smedley, 614 So.2d 439 (Ala. 1993), and Thompson, supra. Rather, a significant amount of relevant evidence was preserved, and Vesta and Wausau must carry their burden of proof as to defect and causation relying on that evidence. The defendants need not prove what caused the fire; their defense need focus only on the insufficiency of the plaintiffs' proof in that regard.
B. Culpability of the offending parties.[5]
The defendants do not argue that Vesta and Wausau acted with malicious intent in deciding what evidence to preserve, and the record, when viewed most favorably to Vesta and Wausau under the standard of review applicable to a summary judgment, reflects at most honest error in judgment and/or simple negligence. There is no showing that they allowed evidence that they knew, or should have known, would be favorable to the opposing parties in foreseeable litigation to be discarded. Classic spoliation involves the idea that the offending party "purposefully and wrongfully" destroyed evidence "he knew was supportive of the interest of his opponent." May, 424 So.2d at 603; AlabamaPower Co. v. Murray, 751 So.2d 494, 497 (Ala. 1999).
In the context of choice of sanctions to impose when a party refuses to provide discovery owing under Rules 26 through 36, Ala. R. Civ. P., Rule 37 does not require a showing of willfulness. "Alabama adopted this federal rule[, Rule 37,] subsequent to its 1970 amendment which eliminated the requirement that the failure to respond be `willful.'" Weatherly v. BaptistMed. Ctr., 392 So.2d 832, 835 (Ala. 1981). Nonetheless, "`willfulness' . . . is a key criterion to the imposition of the drastic sanction of dismissal" under Rule 37. Id. See alsoIverson, supra; Blair v. Cooper, 437 So.2d 1249, 1251-52
(Ala. 1983). In the context of whether a summary judgment *Page 97 
should be entered against a plaintiff alleged to have caused or allowed material evidence to be destroyed, the culpability analysis is somewhat different. Technically, a summary judgment should be entered against a plaintiff only when there is no genuine issue of material fact and the movant-defendant is entitled to judgment as a matter of law. Rule 56(c), Ala. R. Civ. P. Nonetheless, our cases, and those of the Alabama Court of Civil Appeals, have approved of the "sanction" of the entry of a summary judgment against a plaintiff, either partial or entirely, in certain instances of spoliation: Thompson, Copenhagen,Verchot, Vesta Fire Ins. Corp., supra; Alfa Mut. Ins. Co. v.Ray's Refrigeration, 682 So.2d 452 (Ala. 1996), no-opinion affirmance (Houston, J., dissenting); and Smedley, supra (judgment entered on jury verdict for plaintiff reversed and case remanded with instruction that case be dismissed).
In each of those cases either all relevant evidence was destroyed with full appreciation of its significance to anticipated litigation (Thompson, Verchot, Smedley) or the dismissal was upheld only as to those claims based on the destroyed evidence and reversed as to those claims based on retained evidence (Copenhagen and Vesta Fire Ins. Corp.; see also Cincinnati Ins. Co., supra). A summary judgment for the defendant based on spoliation has been reversed where the defendant had adequate access to the article in question before it was destroyed, Ex parte General Motors Corp., 769 So.2d 903
(Ala. 1999), and where the plaintiff did not act willfully,Joyner (judgment as a matter of law entered at conclusion of trial reversed); Buzbee v. Alabama Waste Servs., Inc.,709 So.2d 61 (Ala.Civ.App. 1998). We approved the denial of the defendant's motion for a new trial premised on spoliation inWal-Mart Stores, supra, because of the lack of proof that the plaintiff had acted with knowledge of the significance of the evidence and with the intent to inhibit the defendant's case.
C. Fundamental Fairness.
Although the defense expert testified that no one can draw any reliable conclusions concerning the cause of the fire based on the remaining evidence, the plaintiffs' experts Young and Jones are of the opposite view, and the plaintiffs will have the burden of proving from that evidence their theory of the case. As discussed later in this opinion, the giving of "adverse interest" and "burden shifting" jury instructions is within the trial court's sound discretion and can compensate for any undue disadvantage the defendants can demonstrate due to the absence of relevant evidence allowed by the plaintiffs to be discarded.
D. Alternative sources of information.
As noted, a wealth of relevant evidence survives, in the form of eyewitness observations of the outbreak and progress of the fire, the video taken by the security camera, photographs, reports, and the HVAC unit, its disconnect panel, and the bulk of its conduit.
E. and F. Restriction of claims; Alternative sanctions.
The trial court has the option of restricting the plaintiffs' claims to those based on the remaining evidence. It may disallow or restrict any claim predicated indispensably on evidence no longer available. It may fashion "adverse interest" and "burden shifting" instructions along the lines suggested by Justice Lyons in his dissent in Murray, 751 So.2d at 503-04:
 "I write specially to state that I do not consider a spoliation instruction allowing an inference of wrongdoing from the destruction to be precluded every time *Page 98 
the alleged spoliator makes a potentially self-serving claim of negligence. In such instances, the victim of spoliation should not be deprived of such an instruction merely upon the spoliator's asserting, `Oops, I dropped it.' However, in order to overcome such an assertion by the alleged spoliator, the victim should do more than simply prove the occurrence of the destruction, as was the case here. The victim should, however, be entitled to a spoliation instruction upon adducing evidence that would be sufficient for the jury to infer the commission of an intentional act — evidence such as the rarity of such an occurrence of destruction in the ordinary course of business; the frequency with which such a destruction occurs under circumstances that make a claim possible; inconsistencies in the testimony of those asserting that simple negligence caused the destruction; or other evidence challenging the credibility of the persons claiming the destruction was caused merely by negligence.
 "Even in instances where the circumstances surrounding the destruction of evidence suggest simple negligence, an instruction that is not so severe as to allow an inference of wrongdoing based on the fact of the destruction, but that shifts the burden of proof, might be appropriate, especially where the plaintiff has satisfied all other elements necessary to defeat a motion for a judgment as a matter of law. See Welsh v. United States, 844 F.2d 1239, 1246 (6th Cir. 1988), where the court recognized that `[d]estruction of potentially relevant evidence obviously occurs along a continuum of fault — ranging from innocence through the degrees of negligence to intentionality.' The Welsh court then analyzed the resulting penalties that are possible dependent upon the circumstances of each case, going from nothing to a burden-shifting rebuttable presumption to an inference that the missing evidence would have been unfavorable to the spoliator. A burden-shifting instruction in the case of a merely negligent loss would not require the innocent party to suffer the consequences resulting from the fact that his or her burden of proof has been made greater by the negligence of the adversary, and, at the same time, it would not impose an excessively harsh sanction upon a merely negligent party."
See also the adverse-interest charges approved in Murray and inCampbell v. Williams, 638 So.2d 804 (Ala. 1994). Thus, for example if an evidentiary basis for an adverse-interest charge premised on a finding by the jury of a wrongful destruction of evidence by the plaintiffs is established at trial, an instruction could be formulated relating to the inference the jury could draw adverse to the plaintiffs' theory of causation.
Bearing in mind our "long-established and compelling policy objective of affording litigants a trial on the merits whenever possible," Iverson, 553 So.2d at 89, and considering the factors and alternative sanctions discussed above, we conclude that the trial court exceeded its discretion in employing "the most severe sanction that a court may apply," Iverson,553 So.2d at 87. At the summary-judgment stage we must accept the explanations given by the plaintiffs for how and why various items become unavailable, including in this case the professed opinion and judgment of their experts that materials at the fire scene that were allowed to be demolished were not "germane" to a determination of the cause of the fire. Thus, viewing the record most favorably to Vesta and Wausau, we conclude that their culpability was of a relatively low range "along a continuum of fault." Furthermore, *Page 99 
there has not been complete destruction of material evidence; rather, a significant body of evidence remains. The plaintiffs have the burden of proving their theory of causation from that evidence whereas the defendants have no affirmative burden to establish a cause for the fire.
The defendants have argued plausibly in their briefs to this Court numerous reasons why the causation sequence postulated by the plaintiffs' experts is flawed and invalid, including testing data they say indisputably was derived by the Sentry technician who repaired the HVAC unit approximately three weeks before the fire and that they say conclusively contradicts the plaintiffs' theory of causation. Seemingly the defendants will be able to mount an adequate defense even in the absence of the missing evidence. Having concluded that the summary judgments for the defendants cannot be affirmed on the basis of spoliation, we next consider the summary judgments entered for Lenz-Ramseur and Landmark on alternative grounds.
 The Summary Judgment for Lenz-Ramseur
The trial court entered the summary judgment for Lenz-Ramseur on the separate ground that the plaintiffs' expert Jones did not establish that Lenz-Ramseur caused the fire. The trial court concluded that Jones opined that the size of the fuse on the unit disconnect located on the HVAC unit did not cause or contribute to the fire and that Jones's remaining opinions were so speculative that they could not provide a basis for the plaintiffs' claims against Lenz-Ramseur.
Milam hired Lenz-Ramseur to install the HVAC unit. Lenz-Ramseur installed the unit, including the duct work, registers, and grills, but its work did not include any of the electrical work involved in the installation. The unit installed was manufactured by Trane; it had been substituted for the unit originally specified, manufactured by York. The substitution was made by Hollywood and approved by Milam.
Jones's criticism of Lenz-Ramseur's installation of the Trane unit was that the Trane unit called for 150-ampere fuses rather than the 200-ampere fuses specified for the York unit. Jones charges that Lenz-Ramseur installed the unit with "improper fusing," i.e., with 200-ampere fuses. He testified as follows:
 "Q. Mr. Jones, knowing that Lenz-Ramseur did not perform any of the electrical wiring in relation to the HVAC system, would your answer remain the same that you criticized them for improper fusing. . . .
 "A. I'm looking at page 8 of 8 of my notes of Hollywood Video. I am looking at Trane data that I consolidated from various reports from Trane. There is a statement on there that the maximum fuse size or maximum circuit breaker, and HACR Breaker, is 150 ampere. The circuit that it was hooked up to was a 200 ampere circuit. Yes, they should have checked that.
 "Q. So your opinion is that Lenz-Ramseur should have checked the ampere wattage so to speak?
 "A. It was with their unit substitution that had the smaller ampere requirements.
 "Q. You're talking about the substitution of the unit from the York system to the Trane system?
"A. Yes.
 "Q. Okay. So its your opinion that Lenz-Ramseur had an obligation to determine that wiring — to determine *Page 100 
whether the wiring of the Trane system was appropriate?
 "A. The answer to that question is no. That doesn't refer to the fuses. Fuses are required by their unit. It's required by their specification for their unit from Trane. This is something their service people when they do it normally would check if it has the proper fuse size so that the unit is not hooked up improperly.
 "Q. . . . You're not testifying that Lenz-Ramseur had any obligation to make sure the wiring of with the Trane system was appropriate?
"A. Correct."
Later in the same deposition, Jones also testified:
 "Q. Mr. Jones, is it your testimony that the size of the fuse on the disconnect unit that connects to the air conditioning unit caused or contributed to this fire?
 "A. I really don't have an opinion that it did or didn't."
Vesta and Wausau point out, however, that Jones's testimony with respect to the fusing in the unit disconnect on the HVAC itself does not affect his testimony that Lenz-Ramseur had a duty to alert the proper parties about the disparity in the fusing in the service disconnect, the point at which the HVAC was connected to the electrical system. Jones's affidavit and testimony also indicate that this disparity allowed more electrical current into the HVAC circuit than it was designed to accommodate, thus resulting in an "over-fused" condition, which, coupled with inadequate grounding and other electrical installation faults, probably resulted in the short circuit that caused the fire. That is, Jones's testimony indicates that had the HVAC been connected with the proper fusing, the fuses would have blown before the insulation in the conduit degraded and caused the short circuit that in turn caused the fire. In paragraph 22 of his affidavit of February 25, 2003, Jones stated:
 "Lenz-Ramseur, as the installer of the HVAC unit, had a duty to determine that the fuse sizes for the HVAC unit were proper, especially in light of the fact that the units were switched once the plans were issued. Lenz-Ramseur also had a duty to coordinate with the electrical designer. Lenz-Ramseur did not follow through with these duties. Had Lenz-Ramseur followed through, it would have noted and procured the change of the improper fuse size, avoiding the damages in this case."
The plaintiffs rely on the settled rule that the question of proximate cause is usually a question of fact for the jury. "The question of proximate causation is ordinarily one for the jury, if reasonable inferences from the evidence support the plaintiff's theory. Marshall County v. Uptain, 409 So.2d 423
(Ala.[1981])." Garner v. Covington County, 624 So.2d 1346, 1349
(Ala. 1993). See also Green v. Alabama Power Co.,597 So.2d 1325 (Ala. 1992); and Cain v. Sheraton Perimeter Park SouthHotel, 592 So.2d 218 (Ala. 1991). The defendants, however, point out that this Court has also indicated that there are circumstances under which the issue of proximate cause would properly be resolved as a matter of law. For example, in Exparte Mobile Power Light Co., 810 So.2d 756 (Ala. 2001), the homeowners, whose house had been destroyed by a fire allegedly caused by faulty wiring, and their insurer sued the electrical contractor who had repaired the electrical service to the house approximately two years before the fire. Both the plaintiffs and the defendant presented expert witnesses, and the defendant's expert, Ted Blunt, testified that the electrical work he had inspected *Page 101 
was correctly installed and that there was no breach of any applicable standard of care. George Casellas, the plaintiffs' expert, testified that the fire might have resulted from improper tightening of the connection bolts in the circuitry, and he also offered other scenarios in which intervening electrical work might have caused the fire. This Court stated:
 "The trial court correctly relied on the testimony of Casellas and Blunt in entering the summary judgment for Mobile Power. Casellas's deposition and affidavit, taken in the light most favorable to Safeco, were speculative at best. Mobile Power was potentially responsible only under the first of Casellas's three possible scenarios. As for the second and third possibilities, no conceivable negligence by Mobile Power could have caused a mechanical failure of the screwed lug or a thermal shrinkage of the conductor inside the lug. Safeco presented no evidence indicating that the first possibility was any more probable than the other two. Furthermore, Blunt's deposition established that Mobile Power used proper lug torque during installation; that precluded the first of Casellas's three possible causes for the fire. The combined testimony of Casellas and Blunt failed to prove that the possibility of improper lug torque was more than conjecture. This Court has stated:
 "There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination. . . .'
 "Southern Ry. [v. Dickson], supra, 211 Ala. [481] at 486, 100 So. [665] at 669 [(1924)], and [Ex parte] Diversey Corp., supra, 742 So.2d [1250] at 1254 [(Ala. 1999)]."
810 So.2d at 761.
We conclude that the situation described in Ex parte MobilePower Light is not analogous to the instant case. Viewing the evidence in a light most favorable to the nonmovants, we note that Jones testified that Lenz-Ramseur had a duty to detect the improper fusing in the unit and to alert the proper parties of the potential problems that could result from the improper fusing. Moreover, Jones states that had Lenz-Ramseur alerted the proper parties of the fusing problem, the damage in this case — the fire — could have been avoided. Accordingly, the summary judgment for Lenz-Ramseur must be reversed.
 The Summary Judgment for Landmark
The trial court supported the summary judgment for Landmark on the alternate grounds that the plaintiffs' negligence and breach-of-warranty claims were subsumed in their AEMLD claims and that Landmark had provided the plaintiffs no express warranty. With respect to the trial court's determination that the plaintiffs' negligence and breach-of-warranty claims were subsumed by their AEMLD claims, the trial court's determination might have been supportable under Veal v. Teleflex, Inc.,586 So.2d 188 (Ala. 1991), a case that discussed circumstances under which the strict-liability doctrine of the AEMLD might be viewed as imputing negligence to a defendant as a matter of law.[6] *Page 102 
More recently, however, and after the entry of the summary judgment for Landmark, this Court specifically addressed the question whether a negligence claim is subsumed in a AEMLD claim in Tillman v. R.J. Reynolds Tobacco Co., 871 So.2d 28, 34-35
(Ala. 2003):
 "It must be remembered, however, that the AEMLD, as established in Casrell [v. Altec Industries, Inc., 335 So.2d 128 (Ala. 1976),] and Atkins [v. American Motors, Corp., 335 So.2d 134 (Ala. 1976),] is and example of judicial legislation,' not of legislative enactment. Keck v. Dryvit Sys., Inc., 830 So.2d 1, 8 (Ala. 2002). This Court warned last year in Keck
that `[j]udicial decision-making should not be seen as the opportunity to legislate.' 830 So.2d at 8. Alabama remains a common-law state, and therefore common-law tort actions `so far as [they are] not inconsistent with the Constitution, laws and institutions of this state . . . shall continue in force, except as from time to time . . . may be altered or repealed by the Legislature.' § 1-3-1, Ala. Code 1975. We will not presume to so define the boundaries of the judicially created AEMLD so that it subsumes the common-law tort actions of negligence and wantonness against the retailer defendants."
See also Spain v. Brown Williamson Tobacco Corp.,872 So.2d 101, 111 (Ala. 2003) (discussing at some length the distinction between a breach-of-warranty claim under the Uniform Commercial Code and a claim under the AEMLD, and stating that "a claim alleging breach of an implied warranty of merchantability is separate and distinct from an AEMLD claim and is viable to redress an injury caused by an unreasonably dangerous product").
In addition, Vesta and Wausau assert that at this stage of the litigation they are proceeding with their negligence and breach-of-warranty claims in the alternative to their AEMLD claims, as they are permitted to do under Rule 8(e)(2), Ala.R.Civ.P. That rule provides, in pertinent part:
 "A party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal or on equitable grounds, or on both."
Thus, Vesta and Wausau are permitted to plead negligence and breach-of-warranty claims to the extent that they claim that Landmark provided deficient construction or installation services and they can present AEMLD claims with respect to a claim that Landmark provided a defective product.
For example, in the case of Keck v. Dryvit Systems, Inc.,830 So.2d 1 (Ala. 2002), this Court discussed the test for determining whether an item incorporated into real property, such as the HVAC in this case, may be considered a "product" for purposes of the AEMLD. That test involves determining whether the item is a *Page 103 
part of the structural integrity of the building that is expected to last for the life of the building, so that it is not a "product," or whether the nature of the item is such that one would reasonably expect to repair or to replace it, so that it is a "product." In the case of the HVAC mounted on the roof of a building, it is certainly conceivable that the plaintiffs could show claims based on negligence in the installation of the HVAC as distinct from a claim that the HVAC or a portion of it was an unreasonably dangerous product under the AEMLD. In fact, Wausau concedes in its briefs to this Court that if it is determined that the construction of the building does not involve a "product," then its AEMLD claim should be dismissed. We therefore conclude that the plaintiffs' negligence claims and breach-of-warranty claims were not subsumed by their AEMLD claims and that this rationale is not a proper basis for supporting a summary judgment for Landmark as to those claims.
With respect to the trial court's determination that Landmark had provided no express warranty, the plaintiffs rely on paragraph 4.5.1 of the "Standard Form of Agreement Between Contractor and Subcontractor" executed between Milam as the general contractor and Landmark as a subcontractor. That contract also refers to A M as the owner of the building housing the video rental store and states:
 "The Subcontractor warrants to the Owner, Architect, and Contractor that materials and equipment furnished under this Subcontract will be of good quality and new unless otherwise required or permitted by the Subcontract Documents, that the work of this Subcontract will be free from defects not inherent in the quality required or permitted, and that the work will conform with the requirements of the Subcontract documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Subcontractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Subcontractor, improper or insufficient maintenance, improper operation, or normal wear and tear under normal usage. This warranty Shall be in addition to and not in limitation of any other warranty or remedy required by law or by the Subcontract Documents."
Vesta, as the subrogee of the owner, A M, asserts that this provision constitutes an express warranty that inured to its benefit.
Further, both Vesta and Wausau assert that paragraph 4.5.1 is an express warranty for their benefit because they are third-party beneficiaries to the contract. Alabama law is well settled that parties who are directly benefited by a contract that does not expressly name them may have a cause of action under the provisions of that contract.
 "Alabama law is clear to the effect that one for whose benefit a valid contract has been made, although that person is not a party thereto and does not furnish any consideration therefor, may maintain an action on the contract against the promissor. Anderson v. Howard Hall Company, 278 Ala. 491, 179 So.2d 71 (1965); Mutual Benefit Health Accident Association of Omaha v. Bullard, 270 Ala. 558, 120 So.2d 714 (1960); Tennessee Coal, Iron Railroad Co. v. Sizemore, 258 Ala. 344, 62 So.2d 459 (1952); Employers Ins. Co. of Alabama v. Rhodes, 240 Ala. 226, 198 So. 616 (1940); Employers Ins. Co. of Alabama v. Johnston, 238 Ala. 26, 189 So. 58 (1939); Barlowe v. Employers Ins. Co. of Alabama, 237 Ala. 665, *Page 104 188 So. 896 (1939). The only condition being that the third person must have been intended to be directly and not incidentally benefited. Anderson v. Howard Hall Company, supra; Brown v. Fogarty, 221 Ala. 283, 128 So. 376 (1930)."
Harris v. Board of Water Sewer Comm'rs of City of Mobile,294 Ala. 606, 611, 320 So.2d 624, 628 (1975). Although we note that Vesta is plainly subrogated to A M's interest, Wausau is subrogated to the rights of Hollywood, the occupant of the building. There is certainly a genuine issue of material fact as to whether the occupant would be a third-party beneficiary of the construction contract and of paragraph 4.5.1. under Harris. The law of subrogation is clear that Wausau acquires the same legal status Hollywood might have. American Liberty Ins. Co. v.Am-South Bank, 825 So.2d 786 (Ala. 2002); InternationalUnderwriters/Brokers, Inc. v. Liao, 548 So.2d 163 (Ala. 1989). Thus, to the extent that there is a question of fact concerning Hollywood's right to protection under paragraph 4.5.1. as a third-party beneficiary, Wausau has that same right. Moreover, we have held that the application of an express warranty is a question of fact for the trier of fact. Ex parte Miller,693 So.2d 1372 (Ala. 1997); Fleming Farms v. Dixie Ag Supply, Inc.,631 So.2d 922 (Ala. 1994). Under the circumstances of this case, we conclude that a genuine issue of material fact exists concerning whether Landmark made an express warranty which inures to the benefit the plaintiffs. Hobson, supra. Accordingly, the trial court's summary judgment for Landmark must also be reversed as to this issue.
 The Cross-Appeals and Additional Grounds for the Summary Judgments
Landmark and Sentry both cross-appealed and both asserted additional grounds that they say support the summary judgments in their favor. In addition, the other defendants also assert similar grounds that they say support the summary judgments in their favor in the event we determined, as we did, that the spoliation-of-the-evidence doctrine is inadequate to support the summary judgments. Subject to limited exceptions,[7] an appellate court will affirm a summary judgment on the basis of a law or legal principle not invoked by the moving party or the trial court, even though an appellate court will not reverse a summary judgment on the basis of a law or legal principle not first argued to the trial court by the nonmoving party. Ex parteRyals, 773 So.2d 1011, 1013 (Ala. 2000). See also Cashion v.Torbert, 881 So.2d 408 (Ala. 2004), and Smith v. EquifaxServs., Inc., 537 So.2d 463 (Ala. 1988). In large part, all of these arguments, whether advanced in the form of a cross-appeal or as separate support for the summary judgments, assert the procedural argument *Page 105 
that the trial court should have struck the plaintiffs' expert testimony, specifically the plaintiffs' evidentiary submissions, and the substantive argument that the plaintiffs' evidence, even if properly considered by the trial court, failed to present substantial evidence that the defendants' allegedly defective work was a proximate cause of the fire.
With respect to the procedural arguments advanced by the defendants, Landmark and Sentry both assert in their cross-appeals that the trial court erred in not striking Jones's testimony. They argue that Jones violated an order of the trial court that he conduct no further inspection of the premises unless he was accompanied by a representative of the defendants. However, Jones testified that he made several appointments with Landmark's counsel in an attempt to comply with the trial court's order, but that Landmark broke those appointments each time. The decision concerning the appropriate sanction for failure to comply with a pretrial order, including whether to exclude the testimony of the noncomplying witness, is within the trial court's discretion. Truck Rentals of Alabama, Inc. v. M.O.Carroll-Newton Co., 623 So.2d 1106, 1112 (Ala. 1993); Mitchellv. Moore, 406 So.2d 347, 350 (Ala. 1981). See also Alford v.State Farm Fire Cas. Co., 496 So.2d 19, 21 (Ala. 1986). We conclude that the trial court did not exceed its discretion in denying Landmark's motion to strike Jones's testimony.
Landmark also challenges the sufficiency of the plaintiffs' response to its motion for a summary judgment, arguing that the trial court should have disregarded the plaintiffs' joint evidentiary submissions because they did not comply with Rule 56(c)(1), Ala.R.Civ.P., which states, in pertinent part:
 "The motion shall be supported by a narrative summary of what the movant contends to be the undisputed material facts; that narrative summary may be set forth in the motion or may be attached as an exhibit. The narrative summary shall be supported by specific references to pleadings, portions of discovery materials, or affidavits and may include citations to legal authority. Any supporting documents that are not on file shall be attached as exhibits. If the opposing party contends that material facts are in dispute, that party shall file and serve a statement in opposition supported in the same manner as is provided herein for a summary of undisputed material facts."
Landmark argues that the plaintiffs's responses to its motions for a summary judgment were deficient in that they did not include the appropriate narrative summary, and it also argues that the response was not filed at least two days before the hearing on the motions as required by Rule 56(c)(2).
However, our review of the record shows that all the parties made numerous evidentiary filings and counter-filings with respect to various summary-judgment motions during the period between March 2, 2001, and March 3, 2003; the plaintiffs' joint evidentiary submission, consisting of numerous reports and exhibits already of record, was filed on March 3, 2003. The documents constituting the plaintiffs' joint evidentiary submission had been in the defendants' possession much earlier. The defendants' summary-judgments motions were argued on March 5, 2003. The plaintiffs' evidentiary submission contained a number of summaries this Court has held to be compliant with the requirements of Rule 56(c) for a response to a motion for a summary judgment. See, e.g., George v. Raine, 895 So.2d 258
(Ala. 2004); Cashion, supra; Northwest Florida Truss, Inc. v. *Page 106 Baldwin County Comm'n, 782 So.2d 274 (Ala. 2000); andInternational Fid. Ins. Co. v. Gilliam, 659 So.2d 24 (Ala. 1995).
With respect to the timeliness of the plaintiffs' filings, we note that Rule 6(d), Ala.R.Civ.P., vests discretion in the trial court concerning the acceptance of filings, and this discretion has often been recognized in case authority. See, e.g., Speer v.Pin Palace Bowling Alley, 599 So.2d 1140 (Ala. 1992); Turner v.Hayes, 719 So.2d 1184 (Ala.Civ.App. 1997), reversed in part on other grounds, Ex parte Atmore Community Hosp., 719 So.2d 1190
(Ala. 1998). The circumstances of this case reveal complex and ongoing litigation, and we do not find that the trial court exceeded its discretion in considering the plaintiffs' responses to the defendants' motions under such circumstances.
Landmark further argues that this Court should apply the tests for admitting expert testimony employed in Daubert v. MerrellDow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786,125 L.Ed.2d 469 (1993), and Frye v. United States, 293 F. 1013
(D.C. Cir. 1923), to exclude consideration of Jones's testimony by the trial court. This Court has not yet explicitly adopted theDaubert test. See General Motors Corp. v. Jernigan,883 So.2d 646 (Ala. 2003), Slay v. Keller Indus., Inc., 823 So.2d 623
(Ala. 2001), and Courtaulds Fibers, Inc. v. Long, 779 So.2d 198
(Ala. 2000). Further, we decline to adopt Daubert under the circumstances of this case. Our review of the record and of the arguments advanced by the defendants does not support the conclusion that the defendants are challenging the validity of scientific principles relating to electrical engineering, nor do we read the defendants' arguments as attacking Jones's qualifications as an expert. Rather, the defendants assert that Jones's conclusions are improperly speculative and without evidentiary foundation. These are arguments that invoke a consideration of the admissibility of the evidence under the Rules of Evidence. Rule 702, Ala.R.Evid., states:
 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
Moreover, the trial court has broad discretion over whether to consider a witness qualified as an expert and to consider that witness's expert testimony.
 "`[A]n expert witness' competence to testify is an inquiry substantially within the discretion of the trial judge. [An appellate court] will not disturb the trial judge's finding of expert qualifications vel non, unless there is a clear abuse of this discretion.' Cobb v. State, 50 Ala.App. 707, 710, 282 So.2d 327, 329 (1973), citing King v. State, 266 Ala. 232, 95 So.2d 816 (1957)."
Slay, 823 So.2d at 625. See also Rule 104, Ala.R. Evid.;Southern Energy Homes, Inc. v. Washington, 774 So.2d 505 (Ala. 2000); Rodgers v. Adams, 657 So.2d 838 (Ala. 1995). Our review of the record supports the conclusion that the trial court did not exceed its discretion in finding that Jones was properly qualified as an expert under Rule 702 and in considering his testimony.
Landmark also argues that the "economic loss doctrine" set out in Lloyd Wood Coal Co. v. Clark Equipment Co., 543 So.2d 671
(Ala. 1989), bars the plaintiffs' negligence claims. The economic-loss rule prevents tort recovery when a product damages itself, causing economic loss, but does not cause personal injury or damage *Page 107 
to any property other than itself. East River S.S. Corp. v.Transamerica Delaval, Inc., 476 U.S. 858, 871-75,106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). That doctrine states that a plaintiff's AEMLD claim that a product is defective is limited to a contractual recovery when the evidence shows that the defect caused injury to only the product and to no other property. As we discussed earlier concerning the plaintiffs' AEMLD claims in this case, there has been no determination in this case whether the damage was caused by a "product" within the ambit of the AEMLD. Further, the standard form contractor/subcontractor agreement between Milam and Landmark discussed above refers the resolution of disputes to arbitration and does not exclude awards of economic and consequential damages. We conclude that Landmark is not entitled to a partial summary judgment as to the plaintiffs' negligence claims under these circumstances.
The defendants contend that the summary judgments in their favor are due to be affirmed also because, they say, the plaintiffs' evidentiary submissions, especially those regarding Jones, fail to establish the requisite proximate cause to support the plaintiffs' claims. As noted earlier, proximate cause is generally a question for the trier of fact. Uptain, Garner, andGreen, supra. However, the defendants assert that Jones advanced multiple theories of causation and that his testimony was speculative and was not properly supported by facts. In reviewing the evidence in a light most favorable to the nonmovants, as we must under Hobson, supra, we note that Jones does state, with evidentiary support, that various electrical installations and connections concerning the HVAC system were not in compliance with the National Electrical Code or with recognized electrical-installation standards in the industry. Among other things, Jones testified that the unit was connected with a disparity in fusing between its supply circuit and the fuses in the unit, that the unit was improperly grounded, that some of the electrical conduit designed to cover the wires leading to and from the HVAC unit was improperly installed, and that various aspects of the electrical system involving the HVAC unit had been improperly tested or had not been tested at all.
We note first that the fact that Jones considered more than one possible theory for how the allegedly faulty electrical work could have caused the fire as his investigations proceeded does not invalidate his testimony.
 "This Court has never held that an expert is restricted to one set of hypothetically assumed facts for the formation of opinions. Indeed, astute counsel in a single deposition or trial typically may elicit multiple varying conclusions from a single expert witness on the basis of varying sets of assumptions. Moreover, this Court has not precluded even a party from submitting subsequent different testimony based on additional or different information not supplied to the party when he or she initially gave sworn testimony. See Stephenson v. Lawrence County [Bd. of Educ.], 782 So.2d 192 (Ala. 2000); Tittle [v. Alabama Power Co., 570 So.2d 601 (Ala. 1990)], and Rickard v. Shoals Distrib. Inc., 645 So.2d 1378
(Ala. 1994)."
Wade Clinic of Chiropractic, P.C. v. Rayburn, 812 So.2d 1159,1165 (Ala. 2000). After a careful examination of the record, and in light of our determination that the trial court did not err in considering Jones's testimony under Rule 702, Ala.R.Evid., we conclude that that testimony, viewed in a light most favorable to the plaintiffs as nonmovants, is substantial evidence that raises a genuine issue of material *Page 108 
fact concerning causation. The defendants' attacks on Jones's testimony as lacking in evidentiary foundation or as speculative, under the circumstances in this case, address Jones's credibility as an expert, i.e., the weight of his testimony. Our law is well settled that once substantial evidence is adduced, the assessment of the weight of the evidence is left for the trier of fact.Tidwell v. Upjohn Co., 626 So.2d 1297 (Ala. 1993); AlabamaPower Co. v. Courtney, 539 So.2d 170 (Ala. 1988); Baker v.Edgar, 472 So.2d 968 (Ala. 1985). Accordingly, we conclude that the summary judgments entered for the defendants are due to be reversed, and the cause remanded for further proceedings consistent with this opinion.
1021196 — REVERSED AND REMANDED.
1021310 — REVERSED AND REMANDED.
1021324 — REVERSED AND REMANDED.
1021327 — REVERSED AND REMANDED.
1021255 — REVERSED AND REMANDED.
1021326 — REVERSED AND REMANDED.
1021328 — REVERSED AND REMANDED.
NABERS, C.J., and SEE, BROWN, and STUART, JJ., concur.
[1] The plaintiffs do not challenge on appeal the summary judgment for DesignWorx, and DesignWorx is not a party to these appeals.
[2] Sentry does not present any argument in these appeals concerning the propriety of the summary judgment for Sure-Air as to its cross-claims, and that summary judgment therefore is not before us on these appeals.
[3] Split bolts are "U" shaped bolts designed to hold two wires within the "U" tightly together when a nut is tightened on the bolt.
[4] Presumably, the electron auger method is a test available to electrical engineers; Point did not discuss the testing methodology in detail.
[5] Our disposition of the spoliation issue, as hereinafter explained, obviates the need to address Wausau's argument that because Jones and Young were retained initially only by Vesta and made all decisions concerning preservation of evidence while working solely for Vesta, their "culpability" should not be imputed to Wausau, although Wausau later agreed to pay one-half of their fees and use their services.
[6] After Veal, a number of cases held that negligence and wantonness claims were subsumed by an AEMLD claim. See, e.g.,Brock v. Baxter Healthcare Corp., 96 F.Supp.2d 1352 (S.D.Ala. 2000), and Johnson v. General Motors Corp., 82 F.Supp.2d 1326
(S.D.Ala. 1997). However, a number of other cases either recognized that the issue had not been finally decided, seeGrimes v. General Motors Corp., 205 F.Supp.2d 1292 (M.D.Ala. 2002), or permitted negligence and AEMLD claims to coexist under certain circumstances. See, e.g., Flagstar Enters., Inc. v.Davis, 709 So.2d 1132 (Ala. 1997).
[7]
 "This rule fails in application only where due-process constraints require some notice at the trial level, which was omitted, of the basis that would otherwise support an affirmance, such as when a totally omitted affirmative defense might, if available for consideration, suffice to affirm a judgment, Ameriquest Mortgage Co. v. Bentley, 851 So.2d 458 (Ala. 2002), or where a summary-judgment movant has not asserted before the trial court a failure of the nonmovant's evidence on an element of a claim or defense and therefore has not shifted the burden of producing substantial evidence in support of that element, Rector v. Better Houses, Inc., 820 So.2d 75, 80 (Ala. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and Kennedy v. Western Sizzlin Corp., 857 So.2d 71 (Ala. 2003))."
Liberty Nat'l Life Ins. Co. v. University of Alabama HealthServs. Found., P.C., 881 So.2d 1013, 1020 (Ala. 2003). *Page 658