Truck Rentals of Alabama, Inc. ("TRA"), and Rollins Leasing Corporation appeal from judgments on jury verdicts in favor of M.O. *Page 1107 
Carroll-Newton Company, Inc. ("M.O. Carroll"). The jury returned a verdict against TRA in the amount of $196,840.50 on M.O. Carroll's claims of fraud and breach of contract, and against Rollins in the amount of $196,840.50 on M.O. Carroll's claims of breach of contract and conversion. In addition, the jury awarded Rollins and TRA $24,708.50 each on their counterclaims against M.O. Carroll for the rental value of certain vehicles provided by TRA to M.O. Carroll. The trial judge denied motions by TRA and Rollins for a judgment notwithstanding the verdict or, in the alternative, for a new trial, and TRA and Rollins appealed. We affirm.
M.O. Carroll, a wholesale grocer, uses tractor trailer rigs to deliver groceries to small grocery stores in Alabama and surrounding states. In early 1987, Sam Carroll, III, vice president in charge of operations at M.O. Carroll, began negotiating with Bo Harrison, a representative of Truck Rentals of Alabama, regarding the possibility of leasing TRA trucks to meet the business obligations of M.O. Carroll. Initial discussions were not fruitful; however, in December 1987, Sam Carroll began negotiating with Richard Nicholas of TRA regarding the possibility of a business relationship. Nicholas presented Sam Carroll with a proposal to lease 10 trucks for a period of 5 years. Those trucks were to be serviced by TRA, and M.O. Carroll was to have parking privileges on TRA lots. In addition, TRA was to purchase 10 used trucks from M.O. Carroll. Negotiations continued between the parties, and changes were made to the original proposal. Ultimately, M.O. Carroll decided to lease 5 vehicles for 6-1/2 years, with the option to rent additional vehicles at a specified rate. Under the new proposal, TRA was to purchase 16 used trucks from M.O. Carroll and M.O. Carroll would be allowed to set up office trailers at various TRA locations. In addition, TRA would provide fuel for the trucks at cost and perform routine maintenance on the trucks.
The changes to the agreement were to be submitted to the Birmingham office of TRA for approval and, according to Sam Carroll, he was informed that all approval had been received. A draft of the agreement was then drawn up by TRA in January 1988 and signed by Sam Carroll. The document was then sent to the Birmingham office. Almost immediately, TRA began to abide by the terms of the agreement with regard to the delivery of the trucks and M.O. Carroll obtained the insurance required on the leased vehicles pursuant to the contract. TRA also held an orientation meeting with all M.O. Carroll drivers and explained TRA policies and procedures to them. In addition, TRA provided fuel at cost, in compliance with the contract, and performed routine maintenance on the vehicles pursuant thereto. According to the trial testimony, however, Sam Carroll became concerned when M.O. Carroll did not receive a check in payment for the trucks that TRA was to purchase. Sam Carroll testified at trial that he made numerous telephone calls to TRA and was assured, at least on one occasion, that the "check was in the mail." According to Sam Carroll, telephone calls to Buddy Jackson, vice president and general manager of TRA in Birmingham, regarding the status of the check in payment of the used vehicles, went unreturned.
Almost simultaneously with the negotiations between TRA and M.O. Carroll, TRA was negotiating with Rollins Leasing Corporation with regard to the sale of certain TRA assets to Rollins. The sale was to include equipment and leases and, although the agreement between Rollins and TRA provided that all potential leases would not be signed until authorized by Rollins, there was evidence that TRA's home office never informed its district managers and account representatives of this fact and did not discourage them from obtaining new leases during the negotiations. Although TRA appeared to abide by the M.O. Carroll lease to the letter from January to the end of March, with the exception of paying for the used vehicles it was to purchase from M.O. Carroll, no one ever informed M.O. Carroll that TRA or Rollins had not in fact approved the lease or that they had no intention of doing so. Then, on March 29, 1988, Rollins, having refused to accept the lease agreement, had Buddy Jackson of TRA write Sam Carroll and inform him that all trucks should be returned to TRA and that the lease being rejected. *Page 1108 
Following Jackson's letter to Sam Carroll, Rollins's agreement to purchase TRA's assets became effective and Rollins sent M.O. Carroll a letter that stated:
"Dear Customer:
 "Rollins Leasing Corp. acquired the assets of Truck Rentals of Alabama, Inc. and Truck Rentals of Louisiana, Inc. Through that acquisition we have assumed your agreement with TRA.
"We would like to welcome you to Rollins.
". . . .
 "Again, welcome to Rollins. We look forward to meeting your transportation needs now and in the future."
Rollins continued to bill M.O. Carroll for leased vehicles, according to the agreement between M.O. Carroll and TRA; however, following the above-quoted letter, Rollins notified M.O. Carroll of a rate increase that would become effective around the middle of April. When M.O. Carroll notified Rollins that it considered the lease agreement to be binding on Rollins, Rollins proceeded to require M.O. Carroll to return the leased vehicles and refused to service for M.O. Carroll the vehicles that had not yet been returned.
M.O. Carroll filed a complaint against TRA and Rollins on July 7, 1988. Rollins, in turn, filed a complaint against M.O. Carroll on July 8, 1988. The two cases were consolidated on September 22, 1988. TRA and Rollins thereafter filed a counterclaim in which TRA sought rental payments and Rollins incorporated the allegations of its separate complaint.
M.O. Carroll amended its original complaint in November 1988; that complaint is set out in pertinent part as follows:
"COUNT ONE
 "1. On or about December 10, 1987, TRA, through its agent Richard Nicholas, presented to plaintiff a written and signed offer to provide a Full Service Lease Program to plaintiff, which included among other things an offer to lease trucks to the plaintiff at a specific rental rate for a period of five years. Defendant TRA also later agreed to purchase sixteen (16) used trucks from plaintiff for the total sum of $63,333.32. A copy of the written offer is attached hereto as Exhibit A.
". . . .
 "7. Prior to March 30, 1988 defendants suppressed material facts from plaintiff regarding the lease agreement and the asset acquisition and failed to advise them that Rollins did not intend to honor the lease agreement even though defendants were under an obligation and in a position of trust and confidence to so advise plaintiff.
". . . .
"COUNT FOUR
"SUPPRESSION, DECEIT AND FRAUDULENT DECEIT
 "16. Plaintiff hereby adopts and realleges all of the allegations set forth in paragraphs 1-15 above the same as if fully set forth herein.
 "17. Defendants' actions as described above constitute suppression of material facts, deceit, and fraudulent deceit as set forth under Alabama Code § 6-5-102, § 6-5-103, § 6-5-104, respectively. As a direct and proximate result thereof plaintiff has been damaged in an amount exceeding $600,000.00.
 "WHEREFORE, plaintiff claims from defendants all compensable damages incurred by plaintiff which damages exceed $600,000.00, plus interest and costs. Additionally, plaintiff claims punitive damages in the amount of $1,000,000.00 for the suppression of material facts, deceit and fraudulent deceit."
TRA contends that the trial judge erred in submitting the issue of affirmative misrepresentation to the jury. In particular, TRA argues that neither the complaint, the amended complaint, nor the trial brief contained any allegation of an affirmative misrepresentation and that, therefore, TRA lacked sufficient notice to defend against that theory. Instead, it claims to have had notice only of the theory of suppression of material facts. TRA states as follows in its brief on appeal: *Page 1109 
 "Thus, throughout the pre-trial proceedings, M.O. Carroll maintained two theories of fraud: 1) TRA and Rollins failed in an alleged duty to tell M.O. Carroll that Rollins was interested in purchasing TRA's assets and that TRA would not approve Plaintiff's Exhibit 4 unless Rollins approved it, and 2) TRA made a promise to lease trucks to M.O. Carroll when TRA had no intention of doing so."
Contrary to its argument, TRA, by acknowledging theory number (2) as a pre-trial theory of M.O. Carroll's complaint, admits the knowledge of an affirmative misrepresentation theory.
The trial judge's instructions to the jury with regard to misrepresentation include the following:
 "And the third claim, M.O. Carroll in this case is claiming damages from T.R.A. for an alleged legal fraud. That's the third one, that was practiced upon them, that is upon M.O. Carroll. The law charged in the plaintiff's complaint is that T.R.A. made misrepresentations to M.O. Carroll, supposed [sic] material facts from M.O. Carroll and practiced deceit upon them, that is M.O. Carroll, related to the lease agreement at issue.
 "Now, the defendants' answer to the complaint states that they are not guilty of those charges complained therein.
 "If you are reasonably satisfied from the evidence that T.R.A. willfully misrepresented a material fact to M.O. Carroll with intent to induce M.O. Carroll to act thereon and M.O. Carroll did without, knowledge of the falsity, act upon said willful misrepresentation to its damage or detriment, then T.R.A. is guilty of legal fraud.
 "If you are reasonably satisfied from the evidence that T.R.A. misrepresented a material fact recklessly without knowledge of the truth or falsity thereof and with the intent to induce M.O. Carroll to act and that M.O. Carroll acted upon said reckless misrepresentation to its injury, then T.R.A. is guilty of legal fraud.
 "If you are reasonably satisfied from the evidence that T.R.A. . . . by mistake misrepresented a material fact to M.O. Carroll thereby inducing action on the part of M.O. Carroll to its injury, then T.R.A. would be guilty of legal fraud.
 "If you are reasonably satisfied by the evidence that T.R.A. deceived M.O. Carroll by a willful misrepresentation, a reckless misrepresentation or a suppression in order to induce M.O. Carroll to act, and that M.O. Carroll did act thereon to its injury, then T.R.A. is guilty of a deceit which is a legal fraud.
 "I charge you, ladies and gentlemen, that T.R.A.'s knowledge of the falsehood is an essential element of deceit. A fraudulent or reckless representation of the facts as true which T.R.A. did not know to be false, if intended to decide [sic] M.O. Carroll, is equivalent to a knowledge of the falsehood.
 "If you're reasonably satisfied from the evidence that T.R.A. concealed or withheld material facts from M.O. Carroll and without its knowledge of such material facts M.O. Carroll acted to its injury, then T.R.A. would be guilty of legal fraud."
"An action for deceit, under § 6-5-103 and § 6-5-104, results from either a willful or reckless misrepresentation or a suppression of material facts with an intent to mislead."Whitlow v. Bruno's Inc., 567 So.2d 1235, 1241 (Ala. 1990). In the amended complaint as quoted above, M.O. Carroll charged that TRA was guilty of violating § 6-5-103 and § 6-5-104. The amended complaint also charges that TRA agreed to purchase 16 trucks and knew that Rollins had no intention of abiding by that agreement.
Furthermore, we have reviewed the record and we agree with M.O. Carroll that, even if the complaint did not state a claim for an affirmative misrepresentation, such a claim was tried by implied consent. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Rule 15(b), Ala.R.Civ.P. There is evidence in the record that TRA had sufficient notice of the affirmative misrepresentation theory to defend against it, particularly in the depositions taken by the parties during discovery. In *Page 1110 
particular, the deposition of Sam Carroll indicated that he had been told by a TRA representative that the check for the vehicles allegedly purchased pursuant to the agreement between the parties should reach him within a few days. Also, he stated that he had been told that TRA had approved the lease agreement in question.
At trial, Sam Carroll testified as follows:
 "Q: Now, did this proposal [the original proposal submitted by TRA to M.O. Carroll] on the rate, Sam, meet with your approval? Did you — is this what you told Richard Nicholas and Bill Douglas you would accept?
 "A: When he brought — when Richard Nicholas brought the proposal in to me, we met and we went over it and we talked about it at length. Bill Douglas was present in the meeting also. We went over it and we talked about it and they were real hungry to do business with us. And we had had a good relationship before with Bo Harrison. And I felt comfortable with Truck Rentals of Alabama. I told him that we needed to talk about the price of the tractor a little bit and I started doing some figuring myself and basically came up with the conclusion that we could use five tractors rather the 10 tractors and use extra trucks and not have to pay the fixed rate charge per week on all the trucks, but only pay them as we needed them. So we basically talked about using five full-time lease tractors plus T.R.A. providing us with additional tractors on two or three days that were the only days that they were going to be used and we could do that more economical [sic] than pay for all 10 having some days those tractors would be parked.
". . . .
 "Q: . . . What is the next thing that you heard after you talked to Richard Nicholas a couple of times? What then happened?
 "A: What happened then, I got a call sometime the first part — I'm going to say probably around the middle of January and probably the 14th, 15th, 13th, I'm real bad at the dates so I'm not for sure which time, but I got a call and I got a call from Mr. Bill Douglas.
"Q: Okay.
 "A: Mr. Bill Douglas said that all approval has been gotten, he got everything that we agreed on in our meetings, they're going to be able to provide everything that we had negotiated and when would be an appropriate time — would like to do a contract.
"Q: Okay. What did you tell them?
 "A: I told him that I was going out of town. I think I was going out of town on like the 18th and I told him that I would be back in town on the next Saturday.
". . . .
 "Q: Okay. Did you meet with him on Sunday — did you meet with someone on Sunday morning?
 "A: I met with Mr. Richard Nicholas on Sunday morning.
"Q: And what took place at that meeting?
 "A: Basically, the meeting was fairly short. He brought me the contracts, he brought me the addendum, he brought me the — everything that we had agreed to. And I signed the contract on Sunday morning and we shook hands, told me welcome on board, looking forward to starting doing business with us, hope we have a longterm relationship. I said the same thing to him. I said. 'I'm excited, I hope the company's excited and we're excited to be on board with y'all.'
". . . .
 "Q: . . . All right. What happened after you signed the contract?
 "A: After I signed the contract that Sunday morning with Mr. Richard Nicholas, they started delivering trucks in to M.O. Carroll-Newton company. I think they started delivering some of the tractors in Sunday night because basically when they deliver interim trucks in you have to sign for them and you sign the mileage on the truck. The way they charge you the mileage charge is at six and a half cents a mile, it's going to kill you each week and you get a bill for that. So we had to sign when the trucks were delivered to us stating the mileage that was on the truck because starting the first day that truck starts being delivered you have to pay each week *Page 1111 
however many miles that truck is going to run.
". . . .
 "Q: All right. After say two weeks went by, did you have — did you develop any concerns?
 "A: After a couple of weeks, I think about the second week my first cousin, Frank Carroll, came to my office and he said, 'Sam,' he said, 'When are we going to get our check from Truck Rentals of Alabama for the tractors that they bought?' and I said, 'Well, the check hasn't come in yet?' And he said, 'No.' And I said, 'Well, let me call about it.' So, I called Richard Nicholas about when we were going to get our check on the 16 tractors that we had sold to Truck Rentals of Alabama.
"Q: What did he say?
 "A: He told me that he needed to call Bill Douglas and have Bill Douglas call Birmingham to find out when the check would be coming.
"Q: Did he get back with you?
 "A: He got back with me and he said he called Bill Douglas and Bill Douglas was going to get in touch with Buddy Jackson to find out when the check was going to be issued.
 "Q: And what's the next thing that happened in that regard?
 "A: Well, then another week or so went by and the check had not come in. I called Bill Douglas on the phone and asked him the status of the check. He said, 'You mean you haven't gotten the check yet?' I said, 'No, Bill, we have not received the check yet.' He said, 'Well, let me call one more time and find out from Birmingham exactly when you're going to get the check.'
"Q: Now Bill Douglas is Richard Nicholas's boss?
"A: That's correct.
"Q: And what happened after that?
 "A: Then I called — then Bill Douglas called me back and I cannot place the day that he called me He called me back and he told me that he had talked with Buddy Jackson and that we should be receiving our checks by the next Monday."
Based on the pleadings, discovery, and the evidence given at trial, the trial judge did not err in charging the jury with regard to affirmative misrepresentation.
TRA and Rollins next argue that the alleged contract was void under the Statute of Frauds because, they say, it was an agreement not to be performed within a year, but was not expressed in a writing signed by TRA or Rollins. See §8-9-2(1), Ala. Code 1975. They argue that, because the original proposal submitted to M.O. Carroll in December was significantly changed, it cannot constitute the contract. In addition, they contend that the proposal ultimately signed by Sam Carroll in January specifically stated that it would not be binding on TRA until approved and signed by a TRA officer; they contend this despite the fact that the document was drawn up by an agent of TRA and despite the fact that Sam Carroll was advised before the document was drawn up that all approval had been received.
TRA, by entering into performance in accordance with the agreement, may well be estopped to deny that the contract was in force. As previously stated, according to Sam Carroll, a TRA representative had told him that the agreement had been approved and that he should expect the check for the used vehicles within a few days. In addition, testimony at trial revealed that TRA had entered the agreement into its computer and that it usually did not make such entries until after a contract had been approved.
 " 'The purpose and intent of the Statute of Frauds is to prevent fraud, and not to aid in its perpetration.' 73 Am.Jur.2d Statute of Frauds § 562 (1974) (citations omitted). Campbell v. Regal Typewriter Co., 341 So.2d 120 (Ala. 1976); Nelson Realty Co. v. Darling Shop of Birmingham, Inc., 267 Ala. 301, 101 So.2d 78 (1957)."
Dean v. Myers, 466 So.2d 952, 955 (Ala. 1985).
Moreover, M.O. Carroll argues that there were numerous papers that, if considered together, are sufficient to meet the requirement imposed by the Statute of Frauds that the contract be evidenced by a writing signed by the party to be charged. In particular, M.O. Carroll points out that the December *Page 1112 
proposal was accompanied by a transmittal letter signed by a TRA officer and that both parties negotiated changes, which were reported to Sam Carroll as having been approved by TRA. Thereafter, the January agreement itself was prepared by TRA on a TRA letterhead. In addition, M.O. Carroll points out that it received weekly invoices with TRA endorsements consistent with the terms of the agreement.
We agree that the documents taken together suffice to meet the requirement of the Statute of Frauds. The negotiated contract constitutes an "agreement or some note or memorandum thereof expressing the consideration . . . in writing," and the invoices submitted by TRA to M.O. Carroll, as well as TRA's endorsements of checks submitted by M.O. Carroll, are sufficient under these circumstances to meet the requirement of the Statute of Frauds that the writing be "subscribed by the party to be charged therewith." In addition, the letter from Rollins to M.O. Carroll indicates that Rollins had assumed "the agreement" between TRA and M.O. Carroll. Thus, the arguments based on the Statute of Frauds have no merit.
In regard to the conversion claim against Rollins, Rollins contends that the trial judge erred in allowing the testimony of Bruce Sexton, because his name was not submitted on the list of all proposed witnesses in compliance with the pre-trial order. Whether to allow witness to testify is a matter within the sound discretion of the trial judge. Mitchell v. Moore,406 So.2d 347, 350 (Ala. 1981). See also Alford v. State Farm Fire Casualty Co., 496 So.2d 19, 21 (Ala. 1986). We find no abuse of discretion here.
We have considered the remaining arguments of TRA and Rollins, and we find them to be without merit. Therefore, the judgment of the trial court is hereby affirmed as to appeal number 1910924, which is the appeal by TRA and Rollins from the judgment for M.O. Carroll in its action against TRA and Rollins.
The notice of appeal filed by TRA and Rollins included on its face the circuit court docket number for the case that Rollins had filed against M.O. Carroll, so the notice of appeal was treated as raising an appeal in that case, and the number 1910925 was assigned to that purported appeal. No appeal has in fact been taken from the judgment for Rollins in its action that was treated as a counterclaim, so case number 1910925 is due to be dismissed.
1910924 — AFFIRMED.
1910925 — DISMISSED.
HORNSBY, C.J., and MADDOX, ALMON, SHORES, STEAGALL, KENNEDY and INGRAM, JJ., concur.