BRYAN, Justice.
Branch Banking & Trust Company (“BB & T”), Rusty Winfree, and Todd Fullington (hereinafter collectively referred to as “the appellants”) appeal a judgment entered by the Baldwin Circuit Court in favor of Rex A. Nichols (“Sonny”) and Claudene Nichols (“Claudene”) on the Nicholses’ claims against the appellants and on BB & T’s counterclaim against the Nicholses/ We reverse the circuit court’s judgment and remand the cause to the circuit court for further proceedings.

Facts and Procedural Éistory

In late 2005, Sonny began talking to Winfree about obtaining financing from Colonial Bank (“Colonial”), Winfree’s employer, for the purchase of approximately 500 acres of real property in Stapleton, Alabama (“the Stapleton property”). The Nicholses intended to develop the Staple-ton property into a subdivision.' Both Sonny and Claudene had worked in the real-estate market in Baldwin County for sev *339 eral years before the events underlying this action. The Nicholses had a longstanding relationship with Colonial and had worked with Winfree on.prior loans for real-estate-development projects. Sonny testified that he and Winfree were “business friendly” and that he treated Winfree like a confidant and trusted him tq be honest with him.
In December 2005, Sonny wrote Winfree a letter describing a development opportunity for the Stapleton property and requesting financing through Colonial for purchasing the Stapleton property. The letter did not set forth the requested terms for the proposed financing, but Sonny testified that he had been talking to Winfree about structuring the loan as, a “carried-interest” loan, the terms of which were to be similar to. those Colonial had given the Nicholses when financing a prior development project (“the Sehoy project”). The Nicholses describe the loan for the Sehoy project as follows:
“The loan to acquire and develop Sehoy was known as a ‘carried interest loan,’ on which interest accrues and is, added to the principal balance of the loan. ‘Development costs,’ the. money for, constructing the streets and connected structures, are part of the loan balance. The bank is repaid by receiving 80-90 percent of the proceeds from lot sales.”
The Nicholses’ brief, at 7.[1]
Around February 6, 2006, Sonny contacted Winfree and asked whether the ^ requested financing for the Stapleton-prop-erty had been approved: Sonny indicated that he needed to know whether the loan had been approved so that he could send $214,000 in earnest money as a down payment to purchase from Blue Sky Timber Properties, LLC (“Blue Sky”), 362 acres of the Stapleton property owned by Blue Sky. Sonny testified that Winfree told him that .the loan had been approved and that he could send the earnest money, which, Sonny states, was nonrefundable. Sonny paid the earnest money for. the purchase of the 362 acres from Blue. Sky. On February 13, Winfree informed Sonny that Colonial had not yet approved the loan for the Stapleton property, which included the 362 acres.[2]
In ’ mid-February 2006, the Nicholses met with Winfree and Fullington, who was Winfree’s supervisor at Colonial, to discuss the financing for the Stapleton property. Laura Hotard Scott, who worked as Sonny’s executive assistant on development projects, also attended the meeting. Sonny testified that, at the meeting, Fulling-ton apologized to the Nicholses, stating that Colonial could not make a carried-interest loan for the Stapleton property at that -time but that, if the Nicholses would pay the interest on the loan for the first two years, Colonial would “put the interest from that-property onto the development loan,” i.e., it-would carry the interest on the loan going forward. Scott also testified that Fullington promised the Nich-olses, if they would “do the initial purchase of the land and pay the interest for two years, that after that two-year period, [Colonial] would .,. rework the loan with the *340 interest and the development costs to proceed with the project.” Fullington testified that he did not remember making that promise.
On February 27, 2006, the Nicholses executed a loan agreement with Colonial, in which Colonial agreed to lend the Nich-olses, “upon the terms and subject to the conditions herein set forth, a loan in the principal amount up to but not exceeding the sum' of $2,734,515.00,” which was to be “used by [the Nicholses] for business purposes' only to purchase "the [Stapleton] property.” The loan agreement went on to provide that the loan would be “evidenced by and subject to the terms of a promissory note of even date herewith in a form satisfactory to [Colonial], executed by [the Nicholses], and any renewals, modifications or extensions thereof’ and would be secured by, among other things, a mortgage on the Stapleton property. The promissory note and mortgage were also executed on February 27, 2006.
Section 8.02 of the loan agreement provided, in pertinent part:
“All covenants, agreements, representations and warranties made herein or in connection herewith shall survive the execution and delivery hereof and shall continue in full force and effect so long as the Loan or other Liabilities, indebtedness or other obligations to [Colonial] are outstanding and unpaid, and each representation and warranty shall be deemed to have been reaffirmed at the time each advance is made hereunder.”
Section 8.09 of the loan agreement provided, among other things:
“[The loan] agreement, together with the Note and the other Loan Documents, constitutes and embodies the entire agreement and understanding between the parties, supersedes all prior agreements, representations and understandings related to the subject matter hereof or thereof, and may not be modified or amended except by a written agreement executed by the [Nicholses] and [Colonial], No oral promise, agreement, representation or statement made by [Colonial] may be relied upon, or create any liabilities of [Colonial] and shall not be binding or have any effect whatsoever unless reduced to writing and executed by [Colonial].”
The promissory note provided, in pertinent part:
“[The Nicholses] ... HEREBY PROMISE TO PAY, to the order of Colonial Bank, N.A. or its assigns ..., to such account or place as the holder hereof may designate in writing, the principal sum of TWO MILLION SEVEN HUNDRED THIRTY FOUR THOUSAND FIVE HUNDRED FIFTEEN and NO/ 100 UNITED STATES DOLLARS (U.S. $2,734,515.00) or such lesser amount as shall be outstanding at maturity, together with interest on the outstanding principal amount of this Note from the date hereof until such principal has been paid in full, at a variable rate per annum equal to the 30-day LIBOR Index plus 2.25 percent to be adjusted with a floor of 6.86%. [The Nicholses] shall pay interest monthly on the 27th day of each month commencing March 27, 2006 and the 27th day of each month thereafter. The outstanding principal amount under this Note, together with all unpaid interest and any other costs outstanding pursuant to the Loan Documents shall be due and payable on February 27, 2008 (the ‘Maturity Date’).”
Using the loan funds, Sonny purchased the Stapleton property, and the Nicholses began paying interest on the loan, in accordance with the terms of the loan documents. Sonny testified that in late 2007, as the maturity date on the note approached, he began contacting Colonial re *341 garding renewing the loan; he further testified that, around the same time, Winfree became slow to communicate with him. Sonny also testified that before the February 27, 2008, maturity date on the promissory note, he spoke to Fullington about renewing the loan, with Colonial carrying the interest going forward. The February 27 maturity date passed without any change being made to the terms of the loan.
On March 11, 2008, the Nicholses were notified that Colonial would not carry the interest on the loan or provide additional funds for development of the property. On March 18, 2008, the Nicholses signed the first of several 90-day-extension agreements, in which they promised to continue paying interest pursuant to the terms of the original loan documents in exchange for extending the maturity date on the note. Sonny testified that, at the time he signed the loan-extension agreements, he was in severe financial distress because of Colonial’s failure to carry the interest on the loan. <
On September 18, 2008, the Nicholses entered into another 90-day-extension agreement for repayment of the loan. The September 18 extension included both ‘release’, and ‘covenant not to sue’ provisions. The release provision of the September 18 extension provided, in pertinent part:
“In consideration of the agreements of [Colonial] contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, [the Nicholses] — -hereby absolutely, unconditionally and irrevocably release! ], remise[ ] and forever discharge!] [Colonial], and its successors and assigns, ... ([Colonial] and all such other Persons being hereinafter referred to collectively as the ‘Releasees’ and individually as a ‘Releasee’), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever ... of every name and nature, known or unknown, suspected or unsuspected, both at law 'and in equity, which [the' Nich-olses] ... may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any circumstances, action, cause or thing whatsoever which arose or has arisen at any time on or prior to the day and date of this Agreement, including, without limitation, for or on account of, or m relation to, or in any way in connection with the Premises, ... the purchase thereof, the originator of any loan related to the Premises, ... the Loan Documents or this Agreement or transactions thereunder or related therein.”
Sonny argues that in late 2008 and early 2009 he made proposals to Colonial on how the Nicholses might reduce the loan balance. He also testified that he continued to discuss development of the Stapleton property with Colonial throughout 2008 and that Colonial’s officers expressed concerns about whether a market existed for the planned development on the property. Sonny testified that he talked to Fulling-ton about selling five-acre parcels on the Stapleton property. Sonny testified that Fullington said, “Show me there’s a market,” which, Sonny testified, he understood to mean that, if Sonny could show Colonial that a market existed for five-acre parcels, Colonial would lend the Nicholses additional money to develop the Stapleton property to serve that market. Fullington testified, however, that he made no promise to Sonny on behalf of Colonial that if Sonny could demonstrate that a market existed *342 for five-acre parcels on the Stapleton property, Colonial would lend the Nicholses additional money to develop that property.
On June 5, 2009, the Nicholses and Colonial executed a “First Amendment to Loan and Security Agreement,” in which Colonial agreed to extend the maturity date on the note for one year in exchange for a principal-reduction payment of $135,000 from the .Nicholses. The parties renewed the promissory note with a new maturity date of June 5, 2010. Aside from a few specific additions unrelated to our analysis here, the other terms of the loan agreement. and other loan documents remained in effect. Sonny again testified that the Nicholses executed the amended. loan agreement because Colonial’s failure to renew the loan to the carry the interest had put them in a distressed, financial condition.
Between June 10, 2009, and June 23, 2009, Sonny and his son obtained sales contracts for eight parcels of the Stapleton property, but Sonny testified that, when he showed those contracts, to Fullington and asked.Colonial to release the lots from the mortgage securing the promissory note on the property, Fullington insisted that Sonny provide him with closing dates for those sales, not merely sales contracts. Sonny testified that he and Fullington reached an agreement that, as a condition to releasing the parcels from the mortgage, Colonial would receive 80% of the proceeds from the sale of parcels on the Stapleton property. Fullington testified that he agreed to ask Colonial about releasing the parcels for 80% of the sales proceeds but that Colonial did not immediately agree to that arrangement. Sonny testified that, after his meeting' with Fullington, he spent $55,000 to have a plat created for the Stapleton property so that he would be able to close the sales;
Colonial failed, and on August 14, 2009, the FDIC assumed control of its assets and liabilities. The FDIC sold many of Colonial’s assets and liabilities to BB & T, including the Nicholses’ loan. Fullington was hired by BB & T; Winfree was not. In October 2009, Fullington informed Sonny that BB & T would release lots from the mortgage in exchange for 90% of the sale proceeds. Sonny testified that because of the delay in getting the lots released from the mortgage, Sonny was successful in closing only four of the sales for which he had initially obtained contracts.
In early November 2009, BB & T informed the Nicholses that it would not lend them additional funds to develop the property. Sonny testified that this was the first time he had been informed that no development loan would be forthcoming. The Nicholses stopped making interest payments on the loan in November 2009. On March 10, 2010, the Nicholses sued the appellants and fictitiously named defendants, alleging fraud, reformation, negligence, wantonness, and breach of fiduciary duty against all appellants. Against BB & T, the Nicholses also alleged a claim of unjust enrichment and sought damages on a theory of promissory estop-pel. The appellants separately moved the circuit court to dismiss the complaint pursuant to Rule 12(b)(6), Ala. R. Civ. P., alleging that the Nicholses had failed to state a claim upon which relief could be granted. BB & T also filed a counterclaim, alleging that the Nicholses had defaulted on their obligations under the June 5, 2009, promissory note and seeking damages related to that default. The appellants also moved to strike the Nicholses’ demand for a jury trial on the basis that the Nicholses had waived their right to a jury trial in the promissory note. The circuit court denied the motions to dismiss the complaint but granted the motion to strike the request for a jury trial..
*343 In July 2012, the ‘Nicholses amended their complaint to add a claim alleging breach of contract against BB & T and to request a judgment declaring the parties’ obligations to each other in light of BB & T’s counterclaim. The appellants moved the circuit court for a. summary judgment, alleging, among other things, that the Nicholses’ claims were barred by the Statute of Frauds. The circuit court denied that motion. The appellants moved the circuit court to strike the first amended complaint, and the circuit court denied the motion. BB <& T filed a supplemental motion for a partial summary judgment, alleging that the Nicholses’ breach-of-contract claim, which had been added in the amended complaint, was barred by the Statute of Frauds, which motion was also denied.
The circuit court held a trial on three separaté days between October 2012 and September 2013. At the close of the Nich-olses’ evidence and again at the close of the appellants’ evidence, the appellants moved for a judgment on partial findings, pursuant to Rule 52, Ala. R. Civ. P. Those motions were denied. On November 5, 2013, the circuit court entered a judgment in favor of the Nicholses on their claims against the appellants, awarding them $642,000 against Winfree and $11,554,754.84 against Fullington and BB & T. The circuit court also found in favor of the Nicholses on BB & T’s counterclaim against them. The circuit court did not provide in its judgment any findings of fact or conclusions of law, noting that no such findings or conclusions had been requested by the parties. Costs were taxed to the appellants.
The appellants filed a motion to alter, amend, or vacate the circuit court’s judgment and moved the circuit court to make specific findings of fact and to itemize the damages. On November 25, 2013, the appellants also moved for a stay of the judgment and a supersedeas bond. The stay and the bond were granted. The motion to alter, .amend,, or vacate was denied by operation of law.

Issues

■' The appellants allege several grounds as reasons for which, they argue, the circuit court'erred in entering a judgment in favor of the Nicholses. Specifically, they argue that the Nicholses’ claims are precluded under the Statute of Frauds, that the circuit court erred by allowing parol evidence of the alleged oral promises that contradicted the written loan documents, and that the circuit court erred “by permitting the Nichols[es] to rely upon oral statements which were not sufficiently definite to be enforceable.” Appellants’ brief, at 4.
The appellants also argue that the Nich-olses’ recovery is barred pursuant to the legal doctrine set forth in D’Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and the applicable statute of limitations and that the circuit court erred by failing to find that any reliance by the Nicholses on the alleged oral promises, by the appellants was unreasonable as a matter of law. The appellants also argue that the circuit court erred by , failing to enforce the. release provisions in the loan documents.
The appellants also argue that the circuit court erred “in admitting the testimony of expert witnesses who 'were not disclosed timely, who were incompetent to testify, or who were permitted to testify on matters of law” and by allowing the Nich-olses to amend their complaint more than two years after initiating the action without seéking leave of the court or otherwise showing good cause. Appellants’ brief, at 6-7. Finally, BB & T argues that the circuit court erred in denying its counterclaim against the Nicholses.

*344
Standard of Review

“Because the trial court heard ore tenus evidence during the bench trial, the ore tenus standard of review applies. Our ore tenus standard of review is well settled. ‘ “When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error.” ’ Smith v. Muchia, 854 So.2d 85, 92 (Ala.2003) (quoting Allstate Ins. Co. v. Skelton, 675 So.2d 377, 379 (Ala.1996)).
[[Image here]]
“... However, ‘that presumption [of correctness] has no application when the trial court is shown to have improperly applied the law to the facts.’ Ex parte Board of Zoning Adjustment of Mobile, 636 So.2d 415, 417 (Ala.1994).”
Kennedy v. Boles Invs., Inc., 53 So.3d 60, 67-68 (Ala.2010).
Under the ore tenus standard, questions of law are reviewed de novo, see R & G, LLC v. RCH IV-WB, LLC, 122 So.3d 1253, 1256 (Ala.2013) (“We review questions of law de novo.”), and, “ “when a trial court makes no specific findings of fact, “this Court will assume that the trial judge made those findings necessary to support the judgment.” ’ ” Merchants Bank v. Head, 161 So.3d 1151, 1154 (Ala.2014) (quoting New Props., L.L.C. v. Stewart, 905 So.2d 797, 799 (Ala.2004), quoting in turn Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So.2d 375, 378 (Ala.1992)).

Analysis

The appellants first argue that the circuit court erred in entering a judgment in favor of the Nicholses because “[t]he Alabama Statute of Frauds bars all of the Nichols[es]’ claims as a matter of law.” Appellants’ brief, at 25. Alabama’s Statute of Frauds provides:
“In the following cases, every agreement is void unless such agreement or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party to be charged therewith or some other person by him thereunto lawfully authorized in writing:
[[Image here]]
“(7) Every agreement or commitment to lend money, delay or forebear repayment thereof or to modify the provisions of such an agreement or commitment except for consumer loans with a principal amount financed less than $25,000.... ”
§ 8-9-2, Ala.Code 1975.
The Nicholses’ breach-of-contract claim against BB & T is based on Fullington’s alleged promises that Colonial would carry the interest on the loan after the initial two-year term and would lend the Nich-olses additional money for development of the Stapleton property. No party disputes that such agreements are subject to the Statute of Frauds. The parties disagree, however, as to whether the existing agreements satisfy the requirement in § 8-9-2 that the agreements to carry interest on the loan and to lend additional money be memorialized in writing..
The appellants argue that there are no written documents memorializing the alleged promises to carry the interest on the loan or to lend the Nicholses additional money to fund development of the Staple-ton property. The Nicholses argue, in contrast, that § 8.02 of the loan agreement provides for the “survival” of “agreements ... made .,. in connection” with the initial loan and that the mortgage contemplates the assumption of additional debt that would be secured by the property *345 subject to the mortgage. The Nicholses also cite “memoranda signed by [Colonial]” that, they argue, “reflect the essential terms of the agreement and the consideration.” The Nicholses' brief, at 37; The Nicholses argue:
“The [memoranda] indicate that the loan will be repaid from ‘future development’ of the land. Moreover, according to these memoranda, Sonny will ‘hold the property for a period of at least two years before development.’ The memo-randa describe a ‘maturity’ date for the loan in two years,'but other parts show that payment is not expected at that time. The documents show that the source of repayment is ‘future development,’ not to occur for at least two years.”
The Nicholses’ brief, at 38.
Citing Truck Rentals of Alabama, Inc. v. M.O. Carroll-Newton Co., 623 So.2d 1106 (Ala.1993), and City of Greenville v. Greenville Waterworks Co., 125 Ala. 625, 27 So. 764 (1900), the Nicholses argue that, in light of the loan agreement, the mortgage, and the memoranda, the “Appellants are wrong to argue ... that there is no writing supporting any oral promise claimed by the Nichols[es].” The Nicholses’ brief, at 38. However, the documents at issue in Truck Rentals and City of Greenville contained more than just the general language relied on by the Nicholses here. In Truck Rentals, this Court stated:
“We agree that the documents taken together suffice to meet the requirement of the Statute of Frauds. The negotiated contract constitutes an ‘agreement or some note or memorandum thereof expressing the consideration ... in writing,’ and the invoices submitted by [Truck Rentals of Alabama (‘TRA’) ] to M.O. Carroll[-Newton Co. (‘M.O. Carroll’) ], as well as TRA’s endorsements of checks submitted by M.O. Carroll, are sufficient under these circumstances to meet the requirement of the Statute of Frauds that the writing be ‘subscribed by the party to be charged therewith.’ ”
623 So.2d at 1112. In City of Greenville, we noted that an ordinance passed by Greenville’s city council, which set .out the terms of the agreement sought to be enforced in that case, was sufficient to comply with the Statute of Frauds.
In contrast to Truck Rentals and City of Greenville, none of the documents cited by the Nicholses here includes any mention of carried interest on the loan or provides for an additional development loan for the Sta-pleton property, The general statements in the memoranda that repayment was anticipated through future development does not constitute an agreement to lend additional funds to enable that development. Contrary to the Nicholses’ arguments, the alleged oral agreements to modify the loan after the initial two-year term so that the loan would carry interest going forward and to lend additional funds for development of the Stapleton property are not supported by writings sufficient to satisfy the Statute of Frauds. See DeFriece v. McCorquodale, 998 So.2d 465, 471 (Ala.2008) (“[T]hese deeds contain no language that would indicate the Ernest Jr. and Nell actually made the misrepresentations they are accused of making; rather they are standard deeds conveying and partitioning property. ‘Although a writing relied on to satisfy the Statute of Frauds need not be a complete contract, it must contain the essential terms of the alleged contract, “namely, an offer and an acceptance, consideration, and mutual assent tó the essential terms of the agreement.” ’ ” (quoting Fausak’s Tire Ctr., Inc. v. Blanchard, 959 So.2d 1132, 1138 (Ala.Civ.App.2006), quoting in turn Davis v. Barnfield, 833 So.2d 58, 62 (Ala.Civ.App. *346 2002))). Therefore, the Nicholses’ breach-of-contract claim based on those alleged agreements is barred under the Statute of Frauds.
The Nicholses have also alleged several tort claims against the appellants. Specifically, they argue that Winfree and Fullington made fraudulent representations to the Nicholses to induce them to enter into the loan agreement and that BB & T was unjustly enriched by the interest and fees it collected on the loan after the first two years) when it refused to carry interest on the loan going forward. They also argue that the appellants negligently and/or wantonly breached duties of ordinary care and good faith and breached fiduciary duties owed to the Nicholses in negotiating and making the loan because they'made representations that they knew or should have known would induce the Nicholses to “commit substantial funds and enter into long term financial 'obligations based upon their representations and agreements,” and that resulted in the Nicholses becoming “obligated on a loan under terms to which. [they] never agreed.” The Nicholses also argued that the appellants negligently breached their duties of ordinary care and good faith by failing to lend them additional funds to enable development of the Stapleton property and sale of the subdivision lots.[3]
This Court has stated:
“As a general rule, ‘[i]f the proof of a promise or contract, void under the statute of frauds, is essential to maintain the action, there may be no recovery.’ Pacurib v. Villacruz, 183 Misc.2d 850, 861, 705 N.Y.S.2d 819, 827 (N.Y.Civ.Ct.1999) (emphasis added); see also Dwight v. Tobin, 947 F.2d 455, 460 (11th Cir.1991); McDabco, Inc. v. Chet Adams Co., 548 F.Supp. 456, 458 (D.S.C.1982) (it is a “well accepted doctrine that one cannot circumvent the Statute of Frauds by bringing an action in tort, when the tort action is based primarily on the unenforceable contract’); Weakly v. East, 900 S.W.2d 755 (Tex.Ct.App.1995). This is so, because, ‘[i]f a plaintiff was allowed to recover the benefit of a bargain already barred by the statute of frauds, the statute of frauds would become meaningless.’ Sonnichsen v. Baylor University, 47 S.W.3d 122, 127 (Tex.Ct.App.2001). ‘Thus, the statute of frauds bars a [tort] claim _ when , a plaintiff claims as damages the benefit of the bargain that he would have obtained had the promise been performed,’ Id. (emphasis added).”
Holman v. Childersburg Bancorporation, Inc., 852 So.2d 691, 699 (Ala.2002).
The Court in Holman went on to state:
“In accord with the general rule, we hold that where, as here, an element of a tort claim turns on the existence of an alleged agreement that cannot, consistent with the Statute of Frauds, be proved to support a breach-of-contract claim, the Statute of Frauds also bars proof of that agreement to support the tort claim. Were the rule otherwise, the Statute of Frauds could be effectively avoided by the simple wording of the complaint.”
Holman, 852 So.2d at 701. The Court went on to conclude that the Holmans’ various tort claims failed as a matter of law because they all “turn[ed] on proof of an alleged oral promise” that was precluded by the Statuté of Frauds. 852 So.2d at 702.
Like the tort claims in Holman, the Nicholses’ tort claims all turn on proof of alleged representations or promises that are invalid under the Statute of Frauds— *347 namely, that Colonial would modify the loan after the initial two-year term so that Colonial would carry, the interest going forward and that Colonial would lend additional funds for development of the Staple-ton property. Because those tort claims “turn[ ] on the existence of ... alleged agreements] that cannot, consistent with the Statute of Frauds, be proved to sup,port a breach-of-contract claim, the Statute of Frauds also bars proof of [those] agreements] to support the tort claim[s].” Holman, 852 So.2d at 701. Thus, the Nicholses’ tort claims also fail as a matter of law.
The ■ Nicholses have also claimed damages under a theory of promissory' estoppel, alleging that BB & T is estopped from “denying its obligations' and not fulfilling its promises to fund the loan to develop the property” and from denying the Nicholses reimbursement “for ’the damage occasioned by [their] reliance on the promises made and the misrepresentations and wrongful- acts of [Colonial].” This Court has stated:
“The purpose of equitable estoppel and promissory estoppel is to promote equity and justice in an individual case by preventing a party from asserting rights under a general technical rule of law when his own conduct rendérs the assertion of such rights contrary to equity and good conscience. First National Bank of Opp v. Boles, 231 Ala. 473, 479, 165 So. 586, 592 (1936).
[[Image here]]
“Except for the nature of the conduct on which the estoppel is based, the elements of equitable and promissory es-toppel are essentially the same.
, “Promissory estoppel is defined in Bush v. Bush, 278 Ala. 244, 245, 177 So.2d 568, 578 [569-70] (1964):
“‘“A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding ■if injustice can be avoided only by enforcement of the promise.” Restatement of the Law of Contracts, § 90, page 110.’

it ,

“The basic elements of equitable es-toppel are stated -in Dobbs, Remedies § 2.3 (1973): '
“ ‘An estoppel ... has three important elements. The actor, who usually must have knowledge of the true facts, "communicates something in a misleading way, either by words, conduct or silence. The other relies upon that communication. And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.’ ”
Mazer v. Jackson Ins. Agency, 340 So.2d 770, 772-73 (Ala.1976).[4]
The appellants argue that the Nicholses cannot recover on a promissory-estoppel theory because “promissory estoppel [cannot] be used to enforce an oral agreement that [is] void under the Statute of Frauds.” Appellants’ brief, at 41. We agree. This Court has stated:
“[T]o the extent ... the defendants rely on the doctrine of promissory ... estop-pel, their, argument is foreclosed by the implications of Darby [v. Johnson, 477 So.2d 322 (Ala.1985),] and the clear hold *348 ings of our other cases. See, e.g., Hurst v. Thomas, 265 Ala. 398, [402,] 91 So.2d 692[, 695] (1956) [ (‘It is well-settled in Alabama that “an executory agreement which is void under the statute of frauds cannot be made effectual by estoppel merely because it has been acted on by the promisee, and has not been performed by the promisor.’”)]- Although allowing a plaintiffs reliance on non-fraudulent representations to abrogate the Statute of Frauds is a widespread phenomenon, ... Alabama has rejected this approach to date, and the plaintiffs make no compelling arguments based on statutory construction or public policy inviting our reconsideration of this position.”
Durham v. Harbin, 530 So.2d 208, 213 (Ala.1988). Pursuant to our decisions in Durham and Hurst v. Thomas, 265 Ala. 398, 91 So.2d 692 (1956), the Nicholses’ reliance on Winfree’s and Fullington’s alleged “representations, promises, and agreements” that Colonial would modify the loan after the initial two years to carry the interest going forward and would lend additional funds to develop the Stapleton property does not “abrogate the Statute of Frauds.” Durham, 530 So.2d at 213. Therefore, the Nicholses’ promissory-es-toppel claim fails as a matter of law.
The appellants also note that, “[i]n their post-trial promissory estoppel argument, the Nichols [es] also discussed equitable es-toppel even though it was not pleaded.” Appellants’ brief, at 43. The appellants argue that, to the extent an equitable-estoppel claim was properly raised, it is defeated by the Statute of Frauds. The Nicholses argue that, although “equitable estoppel will not ... remedy the breach of a contract,” the Nicholses’ brief, at 52, the doctrine of equitable estoppel “provides the trial court necessary authority to prevent abuse of the statute of frauds,” id,, at 53, and “applies here to preclude [the appellants] from asserting the statute of frauds as a defense.” Id., at 52.
However, the Nicholses’ estoppel claim is based on their allegations that Fulling-ton represented to them that “[Colonial] would advance the funds necessary to construct the subdivision and [to] carry the interest for the next two (2) years,” that they accepted those representations, and that they relied on those representations in paying interest under the terms of the loan documents. The Nicholses also argue that they relied on Fullington’s alleged representation that “if [the] Nichols[es] would ‘show us there is a market ... we’ll advance the funds’” for development of the Stapleton property. These allegations are in the nature of promissory, rather than equitable, estoppel, see Mazer, supra, and, for the reasons set forth previously, fail as a matter of law.
For the foregoing reasons, we hold that the circuit court erred in entering a judgment in favor of the Nicholses on their claims against the appellants. Our decision in this regard pretermits consideration of the appellants’ remaining arguments.
The appellants also argue that the circuit court erred in entering a judgment in favor of the Nicholses on BB & T’s counterclaim, in which BB & T alleged that the Nicholses had defaulted on their obligations under the renewed promissory note. The appellants argue on appeal that the Nicholses “admit that they executed each loan document,” appellants’ brief, at 59-60, and that “the note includes their promise to repay [Colonial] the principal plus interest.” Id., at 60. The appellants also argue that Colonial’s interest in the renewed note was assigned to BB & T and that “[t]here was no material dispute regarding the assignment or balance of the [renewed] note.” Id.
*349 The Nicholses do not dispute the terms or validity of the renewed note or that Colonial’s interest in the renewed note was assigned to BB & T. Instead, they argue that “BB & T should not receive a money judgment on its promissory note when its own conduct has prevented repayment in the manner contemplated by the parties in the Loan Agreement” (i.e., development of the Stapleton property) and that “given the additional agreement made in connection with the 2006 Loan Agreement, to carry interest after the first two years, any money that might be owing in the future is not yet due.” The Nicholses’ brief, at 72-73. However, the Nicholses have cited no authority in support of their argument that BB & T is estopped from seeking enforcement of the promissory note, and the argument that the Nicholses’ obligations under the note have not yet matured , is based on the alleged oral agreement to carry the interest after the initial loan term, which agreement we have stated is invalid under the Statute of Frauds.
Under the terms of the renewed note, the Nicholses were obligated to make monthly interest payments until the note matured on June 5, 2010, at which time “all outstanding principal, costs, and any accrued and unpaid interest [would] be due and payable in full.” The renewed note also provided that “[flailure by the [Nich-olses] to pay this Note on demand, or if no demand, at Maturity or a failure by the [Nicholses] to pay any installment payment required to be paid by this Note when due” constituted default under the renewed note. It is undisputed that the Nicholses stopped making interest payments in November 2009 and that the Nicholses did not pay the note in full by the June 5, 2010, maturity date. Therefore, the Nicholses are in default on the promissory note, and the circuit court erred in entering a judgment in the Nich-olses’ favor on BB & T’s counterclaim.

Conclusion

For the foregoing reasons, we hold that the circuit court erred in entering a judgment in favor of the Nicholses on their claims against the appellants and on BB & T’s counterclaim against them. The judgment is, therefore, reversed and the cause is remanded with instructions to the circuit court to enter a judgment in favor of the appellants on the Nicholses’ claims against them and in favor of BB & T on its counterclaim against the Nicholses and to determine the damages to be awarded on the counterclaim.
• REVERSED AND REMANDED WITH INSTRUCTIONS.
MOORE, C.J., and BOLIN, PARKER, and MURDOCK, JJ., concur.
MAIN, J., recuses himself.

. The appellants note that “[t]he testimony concerning terms such as' 'carried interest' was admitted over objection. Even if true, [the appellants] submit that such evidence would not be material,” Appellants’ brief, at 10 n. 5.

. The appellants argue that, although Sonny says that the $214,000 earnest money was nonrefundable, the Nicholses’ contract with Blue Sky was not effective until signed by Blué Sky, which, the appellants argue, did not occur until February 21. The Nicholses were informed on February 13 that the loan had not been approved. Thus, the appellants argue, the Nicholses had time to get" their earnest inoney back from Blue Sky.

. Apparently the claim seeking reformation was abandoned.

. The appellants argue that the Nicholses did not allege equitable estoppel until their post-trial brief and that they "have no right to' raise such a defense for the first time after trial,” Appellants' brief, at 43. However, the appellants have not cited any authority in support of this argument. See discussion, infra.