MAIN, Justice.
John Boman appeals from a summary-judgment entered by the Etowah Circuit Court in favor of the City of Gadsden. For the reasons stated below, we affirm.
I. Facts and Procedural History
This is the third time this case has been before us. See City of Gadsden v. Boman, 104 So.3d 882 (Ala.2012) (“Boman I ”), and City of Gadsden v. Boman, 143 So.3d 695 (Ala.2013) (“Boman II ”). Rather than restating all the facts and procedural history surrounding this case, we limit our discussion to those facts directly relevant to the issues now on appeal. A more complete factual and procedural background of this case is set forth in Boman I and Boman II.
Boman worked as a Gadsden police officer from 1965 until he retired in 1991. During his employment with Gadsden, police officers operated under various versions of the “City of Gadsden Employee Handbook: Police Department.” The employee handbook applied to uniformed and sworn police officers employed by Gadsden and was periodically revised. At the time of Boman’s retirement, the employee handbook applicable to police officers was the “City of Gadsden Employee Handbook: Police Department (ed. 1989-1992)” (“the handbook”). Section 26 of the handbook, entitled “Employee Benefit Plan,” noted changes to the prior employee-benefit plan. According to the handbook, police-department employees’ then current health-care plan included “Major Medical benefits — 80% UCR [usual, customary, and reasonable charges] for the first $10,000 with 100% of covered expenses ... each year after $2,000 annual out-of-pocket per person.” The employee-benefit plan was issued and administered by Blue Cross and Blue Shield of Alabama (“Blue Cross”). Nothing in the handbook indicates the police-department employee health benefits extended to retirees.
Following his retirement, Boman elected to pay for retiree health coverage through a group plan offered by Gadsden to retired employees. This retired-employee-benefit plan was also administered by Blue Cross and provided substantially similar benefits to those Boman received as an active employee. In 2000, however, Gadsden elected to join an employee-health-insurance-benefit plan (“the plan”) administered by the State Employees’ Insurance Board (“the SEIB”). We explained in Boman I:
“In 2000, Gadsden elected to join the ‘Local Government Health Insurance Plan’ (‘the plan’), a ‘self-insurance health benefit plan administered by the State Employees’ Insurance Board’ (‘the Board’). The claims administrator for the plan was Blue Cross. The plan stated, in pertinent part:
“ ‘Retired Employees
“ ‘Health benefits mil be modified when you or your dependent becomes entitled to Medicare. Coverage under this plan will be reduced by those benefits payable under Medicare, Parts A and B....
“ ‘The [plan] remains primary for retirees until the retiree is entitled to Medicare. Upon Medicare entitlement, the member’s coverage under the [plan] will complement his/her Medicare Parts A and B coverages. Medicare will be the primary payer and the [plan] will be the secondary payer. A Medicare retiree and/or Medicare dependent should have both Medicare Parts A and B to have adequate coverage with the [plan].’
“(Some emphasis added; some emphasis omitted.)
“When Boman turned 65 in 2011, he was receiving medical care for ‘congestive heart failure’ and ‘severe osteoar *301 thritis of the spine.’ After his 65th birthday, Blue Cross began denying his claims for medical treatment based on the failure to provide Blue Cross with a ‘record of the Medicare payment.’ However, Boman had no Medicare credits. ... Boman was hired before March 31, 1986, and, although Gadsden did begin participation in the Medicare program in 2006, Boman’s employee group had not opted to obtain Medicare coverage before Boman retired. Consequently, Boman never paid Medicare taxes and does not claim to have Medicare coverage.”
Boman I, 104 So.3d at 883-84. In the ensuing coverage dispute, the SEIB took the position that, despite the fact that Bo-man had no Medicare credits entitling him to premium-free Medicare coverage, he was still entitled to participate in Medicare by enrolling and paying the applicable premium. Thus, the SEIB determined that the plan was the secondary payer to Medicare.
Boman sued Gadsden, asserting that it had broken an agreement, made upon his employment, to provide him with lifetime health benefits upon his retirement. Bo-man also sued the members of the SEIB charged with administering the plan, challenging the SEIB’s interpretation of the plan.[1]
Boman’s claims against Gadsden were ultimately set forth in his 14th amended complaint, count II of which alleged that Gadsden owed him medical-insurance benefits. Boman contended that he had entered into an employment contract with Gadsden requiring Gadsden to provide him lifetime health-care benefits upon his retirement, that those benefits had vested upon Boman’s reaching 20 years of service as a Gadsden police officer, and that Gadsden had breached that agreement once the plan was deemed secondary to Medicare. Count III alleged that Gadsden committed the tort of outrage by failing to provide Boman primary health insurance. Count IV alleged that Gadsden was guilty of the tort of bad faith by wrongfully denying Boman retirement health benefits.
As to his claims against the SEIB members, Boman requested a judgment declaring that he was not “entitled to Medicare” as that term is defined in the plan and that, therefore, he was entitled to primary coverage under the plan. As more fully explained in Boman II, the trial court initially entered a summary judgment in favor of Boman and ordered the SEIB “to provide medical benefits to John Boman as primary insurance because John Boman is not ‘Medicare eligible.’ ” 143 So.3d at 701. The trial court also granted Boman injunc-tive relief against Gadsden, ordering Gadsden to be responsible for providing medical-benefit coverage to Boman in the event this Court overturned its ruling as to the SEIB. In Boman II, this Court reversed the trial court’s judgment, reasoning that, even though Boman was not entitled to participate in premium-free Medicare coverage, he was nevertheless entitled to participate in Medicare simply by enrolling and paying the applicable premium once he had turned 65 years old. Thus, he was “entitled” to Medicare as that term was used in the plan, and the plan was secondary. We also reversed the order granting injunctive relief against Gadsden because Boman had not provided the mandatory security required by Rule 65(c), Ala. R. Civ. P.
On remand following Boman II, Bowman and Gadsden filed cross-motions for a summary judgment as to Boman’s claims *302 against Gadsden alleging breach of contract, the tort of outrage, and bad faith. The trial court concluded that there was no. employment contract between Boman and Gadsden. The trial court also concluded that the evidence submitted did not establish a viable claim of the tort of outrage or bad faith. Accordingly, the trial court entered a summary judgment in favor of Gadsden and against Boman as to his claims of breach of contract, the tort of outrage, and bad faith. The trial court certified its judgment as final pursuant to Rule 54(b), Ala. R. Civ. P. Boman now appeals the summary judgment as to the breach-of-contract, and the tort-of-outrage claims.
II. Standard of Review
“ ‘ “This Court’s review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-53 (Ala. 2004). In making such a determination, we must review the evidence in the light most favorable to the non-movant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the n'onmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. South-Trust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala. Code 1975, § 12-21-12. ‘[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to. be proved.’ West v. Founders Life Assur. Co. of Fla., 547 So.2d 870, 871 (Ala.1989).” ’
“Prince v. Poole, 935 So.2d 431, 442 (Ala.2006) (quoting Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004)).”
Brown v. W.P. Media, Inc., 17 So.3d 1167, 1169 (Ala.2009).
Ill, Analysis
First, Boman argues that the summary judgment on his beach-of-contract claim is due to be reversed. Specifically, he contends that he entered into an enforceable employment contract with Gadsden, which, he argues, guaranteed lifetime health-care benefits to retirees such as him. He contends that this agreement is memorialized in the various versions of the employee handbook distributed by Gadsden to the city’s police officers during his employment. In support of this argument, Boman cites Hoffman-La Roche, Inc. v. Campbell, 512 So.2d 725 (Ala.1987), for the proposition that an employee. handbook may form the basis of an employment contract. Boman also cites the testimony of a former mayor of Gadsden who testified that the employee handbook was the written understanding of 'the agreement between Gadsden and the police department, Boman alleges that the plan became “worthless” once it became secondary to Medicare. Thus, he argues that Gadsden breached the employment agreement purporting to provide him lifetime health benefits.
The fundamental problem with Bo-man’s argument, however, is that, even accepting his contention that the handbook created an employment contract between him and Gadsden, there is simply no language in any version of the employee handbook that actually relates to retiree health benefits. An essential element of a *303 breach-of-contract claim is “ ‘the existence of a valid contract binding the parties.’ ” City of Gadsden v. Harbin, 148 So,3d 690, 696 (Ala.2013) (quoting Ex parte Alfa Mut. Ins. Co., 799 So.2d 957, 962 (Ala.2001)). Here, Boman has not directed this Court to any provision of the handbook addressing retiree health benefits. It is true that some versions of the employee handbook summarized the health benefits for active uniformed employees of the police department, but nothing in the handbook can be construed as promising health benefits to retirees, much' less definite, vested lifetime benefits; The provisions of the handbook that do mention retirement benefits specifically address those benefits provided through the Policemen’s and Firemen’s Retirement Fund of the City of Gadsden (“the fund”), established by act of the Alabama Legislature.[2] Act No. 80-442, Ala. Acts 1980. The retirement benefits provided by the fund, however, are pension benefits, not health-care benefits. In short, the handbook evidences no agreement on the part of Gadsden to provide Boman with vested lifetime health benefits.
Boman alternatively contends that the doctrine of promissory estoppel entitles him to rélief on his breach-of-contract claim. Again,' however, Boman has not directed this Court to any actual evidence of a promise by Gadsden to provide him with vested lifetime health benefits. In short, Boman has not produced substantial evidence of the existence of a contract providing him with such benefits.[3] Accordingly, the trial court correctly entered a summary judgment in favor of Gadsden on Boman’s breach-of-contract claim.
Finally, Boman contends that the trial court erred in .entering a summary judgment on his tort-of-outrage claim. We have stated that “the tort of outrage is viable only when the conduct is ‘ “so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.” ’ ” Little v. Robinson, 72 So.3d 1168, 1173 (Ala.2011) (quoting Home v. TGM Assocs., L.P., 56 So.3d 615, 631 (Ala.2010), quoting in turn American Road Serv. Co. v. Inmon, 394 So.2d 361, 365 (Ala.1980)). In this case, we agree with the trial court that there is no evidence of outrageous conduct on Gadsden’s part that could possibly satisfy the stringent requirements necessary to support a tort-of-outrage claim. Therefore, the trial court’s judgment as to the tort-of-outrage-claim is due to be affirmed.
IV. Conclusion
For the above reasons, the judgment of the trial court is affirmed.
AFFIRMED.
STUART, BOLIN, MURDOCK, SHAW, WISE, and BRYAN, JJ„ concur.

. Boman’s claims were part of a lawsuit brought by him and 18 other active and retired Gadsden police officers. The SEIB members were joined as defendants following our decision in Boman I, holding that they were necessary parties to Boman’s action.

. In 2002 the fund was terminated and its assets moved to the Employee Retirement System of Alabama, a State-administered retirement fund. See Taylor v. City of Gadsden, 767 F.3d 1124) 1127 (11th Cir.2014).

. We note that Boman does not contend on appeal that there was an oral promise to pay lifetime health benefits and that those benefits vested after 20 years of service. Had an unwritten agreement existed, however, it appears it would be void under the Statute of Frauds because such an. agreement .by its terms could not be performed within one year of its making. § 8-9-2, Ala.Code 1975. Nor could the doctrine of promissory estoppel be used to enforce an oral agreement void under the Statute of Frauds. See Branch Banking & Trust Co. v. Nichols, 184 So.3d 337, 347-48 (Ala.2015).